MANUEL P. ALMADA ET AL. *v.* THE ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued October 3, 1950—decided January 2, 1951

*Robert Ewing,* for the appellant (defendant General Ice Cream Corporation).

*William S. Gordon, Jr.,* with whom was *Stephen M. Riley,* for the appellees (plaintiffs).

INGLIS, J. The question involved in this case is whether the plaintiffs, whose unemployment resulted

from a labor dispute in which they were participants, come within the provision in our Unemployment Compensation Act which allows benefits if the unemployment is caused by a lockout.

The finding of the unemployment commissioners, which was added to by the Superior Court and in which no further corrections may be made, discloses the following facts: General Ice Cream Corporation, hereinafter referred to as the company, was engaged in the business of processing and distributing milk and milk products. It operated in Hartford through two divisions known as Bryant & Chapman and R. G. Miller & Sons, respectively. The plaintiffs were employed by the company and assigned to those divisions either as wholesale or retail drivers or as plant employees. They were members of a union which represented them as the bargaining unit with the company.

On June 12, 1947, the union and the company entered into an agreement relative to wages and working conditions which was effective as of February 1, 1947, for the term of one year, with the proviso that it should be automatically renewed unless either party gave notice of termination before January 1, 1948. It further provided that, if either party wished to change any provisions of the agreement at its renewal, that party should submit its proposals to the other on or before January 1, 1948, and that if the parties, in negotiating a renewal, did not agree as to hours or rates of pay until after the expiration date, the agreement, when ultimately reached, would be retroactive to that date.

On November 28, 1947, the company gave notice to the union that it proposed nineteen changes in the agreement and stated in that notice: "If no agreement can be reached by that date, we consider that our present contract is terminated as of January 31, 1948."

The union wrote the company on December 26 that it desired to make seventeen changes in the agreement. There ensued a considerable number of conferences, but by the end of February, 1948, no agreement had been reached.

On February 25 the union voted to authorize a strike to be called at the discretion of its executive board, and the company was notified of that action. Thereupon the company brought to Hartford from its other divisions about two hundred and fifty of its employees. It posted a notice on February 29 stating that it would do everything in its power to insure continuous deliveries of milk and on March 1 sent out most of its imported employees on the delivery trucks with its regular employees so that the former might become familiar with the routes. It also advised the union that in accordance with the notification which it had given the union on November 28, no agreement having been reached, it would not be bound by the previous contract, and it posted a notice in its plants to the same effect. The notice also stated that it was not the intention of the company to change rates of pay or working conditions but that it would feel free to hire such help as might be necessary to fill vacancies and in the future would make no deductions from wages for union dues, initiation fees, etc.

On the evening of March 1, the members of the union decided that they would strike rather than continue to take the company's imported employees out on the trucks with them. On the morning of March 2, members of the executive board of the union went to the company's premises and observed activity which led them to the conclusion that it was the intention of the company to continue on that day to send out the imported employees with the regular drivers. At 5 o'clock in the morning, the executive board threw

picket lines around the company's premises, and the members of the union, including the plaintiffs, ceased to report for work. The picket lines were maintained until early in November, 1948.

The company issued to each of the plaintiffs a separation slip dated March 2 upon which was checked as the reason for the separation the statement "Left Work Voluntarily." On the morning of March 3, the company advertised in a local newspaper that it wanted help, stating that the openings were for steady, permanent, year-round jobs in the milk business.

On March 5, representatives of the company and of the union met with the state board of mediation and arbitration. At that time the union offered to submit the dispute to arbitration and to call off the strike immediately if the men could return to work. Just what it was the union offered to arbitrate, that is, whether it was the question of a claimed breach of the original contract or whether it was the question what should be the terms upon which the strike should be settled is not stated in the finding. In any event, the company refused the arbitration on the ground that there was no effective agreement existing at the time which required it to arbitrate. It refused to take all of the men back to work because it had hired others to replace those who had walked off the job. From that time on, conditions did not change in any particular essential to the determination of this case until November 4, 1948, when the company and the union settled their dispute. The plaintiffs sought benefits for the period of unemployment commencing March 2 and ending November 4.

Upon the foregoing facts, the commissioners concluded that the plaintiffs' unemployment resulted from a labor dispute in which they were participants but that it was caused by a lockout from March 1, 1948, in that

the company on that day, by refusing to be further bound by the contract, effected a material and sweeping change in the terms and conditions of the plaintiffs' employment. They further concluded that the lockout ·was one which, under our statute, required the payment of unemployment benefits to the employees who had been locked out and that, therefore, the plaintiffs were entitled to unemployment benefits for the period in question. They made no finding that the terms of continued employment imposed by the company were such that the employees could not reasonably have been expected to accept them and that the unemployment which resulted was, therefore, in actuality involuntary on the part of the employees. It appears that the commissioners' conclusion was based on the premise that a lockout, as that term is used in our statute, exists whenever an employer seeks to impose upon his employees as a condition of future employment any material and substantial change which deprives the employees of some advantage they theretofore possessed and the employees leave their work rather than accept that change.

The statute which controls the decision in this case is General Statutes, § 7508. The provisions of that section which are germane are printed in the footnote.[1]

[1] "Sec. 7508. DISQUALIFICATIONS. An individual shall be ineligible for benefits . . . (3) during any week in which it shall be found by the administrator that his total or partial unemployment is due to the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, or at a factory, establishment or other premises operated by his employer in the state of Connecticut, provided the provisions of this subsection shall not apply if it shall be shown to the satisfaction of the administrator that (a) he is not participating in or financing or directly interested in the labor dispute which caused the unemployment, and (b) he does not belong to a trade, class or organization of workers, members of which, immediately before the commencement of the labor dispute, were employed at the premises at which the labor dispute occurred, or at

The gist of those provisions is that an employee shall be ineligible for unemployment benefits during any week in which his unemployment is due to the existence of a labor dispute in which he is a participant as defined in the statute, except that he shall not be disqualified from receiving benefits if his unemployment is due to a lockout "unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess."

Most of the unemployment compensation laws adopted in the various states deny, like ours, benefits when the unemployment or stoppage of work is the result of a labor dispute. This is because it is the purpose of the law to tide persons over periods of involuntary unemployment but not to provide support for them when they are on strike. *Baldassaris* v. *Egan*, 135 Conn. 695, 701, 68 A. 2d 120; *Homer Laughlin China Co.* v. *Hix*, 128 W. Va. 613, 625, 37 S. E. 2d 649. Accordingly, under the statutes generally, it makes no difference what the merits of the labor dispute are. If the unemployment is the result of a labor dispute, the employees are disqualified for benefits, whether it is the employer or the employees who are at fault. It is not competent for the commissioners or the courts to decide that the employees are not at fault and for that reason award benefits. *Johnson* v. *Pratt*, 200 S. C. 315, 333, 20 S. E. 2d 865. Benefits are not to be allowed in the nature of a penalty against the employer for making unreasonable demands upon his employees.

a factory, establishment or other premises operated by his employer in the state of Connecticut and are participating in or financing or directly interested in the dispute; provided any individual whose unemployment is due to a lockout shall not be disqualified, unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess . . . ."

As a matter of fact, the allowance of benefits does not penalize the employer except indirectly by having a bearing on his merit rating. They are paid out of a fund accumulated at the expense of the consuming public. That fund should be disbursed only in strict accord with the terms of the law pursuant to which it is accumulated.

The original Unemployment Compensation Act passed in this state in 1936, in the section relating to disqualification for benefits when the unemployment was caused by a labor dispute, made no exception in cases of lockout. General Statutes, Sup. 1937, § 808d (b) (3). The present provisions on the subject of lockouts were inserted by the General Assembly in 1941. General Statutes, Sup. 1941, § 718f (b) (3). Incidentally, there are, so far as search discloses, only six other states, Arkansas, Kentucky, Minnesota, Mississippi, Ohio and West Virginia, which, in their statutes, expressly except lockouts from the disqualification for benefits in labor disputes. The adoption of this amendment was not a departure from the fundamental policy of the legislation that compensation should be paid only for involuntary unemployment. Nor did it show an intent that compensation was to be awarded as a penalty upon the employer for perpetrating a lockout. It simply evinced a recognition on the part of the General Assembly that the economic distress caused by unemployment resulting from a lockout is just as acute as it is when the unemployment follows a discharge of an employee and the further recognition of the fact that it is just as involuntary on the part of the employee. The question whether the lockout exception to the disqualification provision of the law applies in any given case depends, therefore, on whether what the employer did constituted a lockout within the meaning of that term as it is used in the statute.

The statute itself does not purport to define a lockout. It uses a descriptive phrase. That is, it provides that no disqualification shall exist in the case of a lockout "unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess." That clause qualifies the word "lockout." It limits the kind of a lockout in which there shall be no disqualification to that which does not result from demands of the employees. It must be one that results from the effort of the employer to deprive the employees of some advantage. But that is not a definition of the word "lockout" itself. By its use of the word "lockout," the legislature meant something more than an effort on the part of the employer to deprive his employees of some advantage. If that were all that was intended, it would not have been necessary to use the word "lockout" at all. The legislature could have accomplished its full purpose by making the statute read that the disqualification would not apply if the unemployment resulted merely "from an effort on the part of the employer to deprive employees of some advantage." A lockout, as the word is used in the statute, is the accomplishment of, or the attempt to accomplish, the purpose of depriving employees of some advantage they have by a certain means or method. An act by an employer which changes the terms of employment to the disadvantage of his employees is not necessarily a lockout.

The term "lockout" has often been defined in breach of building contract cases, in cases involving labor disputes and in cases relating to unemployment compensation. It is generally defined as a cessation of the furnishing of work to employees or a withholding of work from them in an effort to get for the employer more advantageous terms. *Iron Molders' Union* v. *Allis-Chal-*

*mers Co.,* 166 F. 45, 52, 20 L. R. A. (N. S.) 315; *Restful Slipper Co.* v. *United Shoe & Leather Union,* 116 N. J. Eq. 521, 524, 174 A. 543; *Panzieri-Hogan Co.* v. *Bender,* 205 App. Div. 398, 401, 199 N. Y. S. 887; *Adkins* v. *Indiana Employment Security Division,* 117 Ind. App. 132, 141, 70 N. E. 2d 31; *Bankston Creek Collieries, Inc.* v. *Gordon,* 399 Ill. 291, 299, 77 N. E. 2d 670; *Magner* v. *Kinney,* 141 Neb. 122, 127, 2 N. W. 2d 689; *Barnes* v. *Hall,* 285 Ky. 160, 177, 146 S. W. 2d 929. This definition of a lockout contains two elements: first, that the employer withhold work from his employees, and, second, that he do so in an effort to force his employees to accept terms more favorable to him. In the present case, so far as the conduct of the company on March 1 is concerned, the question of prime importance is whether that conduct constituted a withholding of work.

Ordinarily, perhaps, the cessation of the furnishing of work is accomplished by closing the plant, "locking" the doors. It may be accomplished, however, in other ways. It may be effected without closing the plant or even without telling the employees that there will be no work for them, by imposing such terms on their continued employment that they could not reasonably be expected to continue to work. *Barnes* v. *Hall,* supra, 178; *Bunny's Waffle Shop* v. *California Employment Commission,* 24 Cal. 2d 735, 740, 151 P. 2d 224. The imposition by the employer of changes in working conditions or wages, even though they deprive the employees of some advantage they already possess, does not necessarily constitute a lockout. Changes in the terms of employment might still be such that under all of the circumstances the employees would be expected in reason to accept them rather than quit work. To constitute a lockout as the word is used in the statute, the conditions of further employment announced by

the employer must be such that the employees could not reasonably be expected to accept them and they must manifest a purpose on the part of the employer to coerce his employees into accepting them or some other terms. If they are anything short of that and the employees cease work, the unemployment which ensues cannot be said to be involuntary on the part of the employees. The theory that unemployment to be compensable must be involuntary is so fundamental to the law that the provision which permits compensation in cases of lockouts could not reasonably be construed to authorize compensation to employees who have ceased to work because of the imposition of changed terms of employment if, in reason, they should have accepted those terms rather than have left their employment. On the other hand, if the employer in an effort to coerce his employees announces changes in the terms of employment which are such that the employees could not in reason be expected to accept them, the unemployment which inevitably results is involuntary so far as the employees are concerned. When an employer brings about a work stoppage by the imposition of terms of employment which his employees could not reasonably be expected to accept, it is just as much a withholding of employment by him as it is when he causes a work stoppage by locking the doors of his plant. A withholding of employment accomplished in either way constitutes a lockout under the statute.

One qualification must be added. It is not a lockout when employees cease work rather than accept the terms proposed if they have any other adequate remedy. If, for instance, there is a valid enforceable contract between the parties determining the terms of employment and the employer announces a change in those terms as a condition of further employment during the term of that contract, the employees might rea-

sonably be expected to rely upon the protection of the contract rather than give up their employment. Whether in reason they should be expected to do so is a question of fact dependent upon the practicability of that course under all of the circumstances. The point is that, in order to constitute a lockout, the conduct of the employer in laying down terms must lead to unemployment inevitably in the sense that the employees could not reasonably be expected to accept the terms and, in reason, there was no alternative for them but to leave their work. The real test of whether the imposition by the employer of changed conditions of employment is a withholding of work so as to constitute a lockout lies in the question whether the conditions imposed are such that his employees could not be expected to continue work under them and, in reason, they had no other course open to them but to leave their employment.

In the present case, the unemployment commissioners did not apply that test. They concluded that the company had perpetrated a lockout by issuing an ultimatum materially changing the terms of employment. They did not determine whether the threat of supplanting the men in their jobs by the importation of outside employees and the repudiation of the contract contained in the notice of March 1 imposed such a change in working conditions that the plaintiffs, in reason, could not be expected to accept them and had no alternative but to stop work.

The courts are bound by the findings of subordinate facts and the reasonable conclusions of fact made by such an administrative tribunal as the unemployment commissioners. *Conte* v. *Egan*, 135 Conn. 367, 372, 64 A. 2d 534. In order that their conclusions of law may stand, however, those conclusions must be supported by their findings of fact. If they have failed to make

a finding of fact on any issue on which a finding is necessary to support their conclusion of law, the case should be remanded to them to make a finding as to what the fact is upon that issue. *France* v. *Munson*, 123 Conn. 102, 106, 192 A. 706; *Tabin-Picker & Co.* v. *Murphy*, 390 Ill. 74, 78, 60 N. E. 2d 410. Whether the terms of employment imposed by the company were such that the plaintiffs had no reasonable alternative but to quit work is a question of fact and not one of law. It depends upon a finding of what, under all the circumstances, it was reasonable to expect the plaintiffs to do. To determine whether there was a lockout in this case, it was essential that the commissioners decide that issue of fact. In the absence of an affirmative finding on the issue, their conclusion that the unemployment of the plaintiffs was due to a lockout is devoid of support.

The commissioners reached no conclusion as to whether the refusal by the company on March 5, 1948, to take back all its former employees constituted a lockout. Inasmuch as this case must go back to the unemployment commissioner for a rehearing, we make the following observations with respect to that incident. It must be borne in mind that there is an essential element of a lockout in addition to the act of the employer amounting to a withholding of employment. That element is that the withholding of employment must be for the purpose of coercing the employees to accept terms of employment more favorable to the employer. Accordingly, in determining whether a lockout existed from March 5 on, because of the position which the company took on that day, the commissioner should determine whether the company's refusal to take the men back was for the purpose of coercing its employees to accept different terms of employment. In order for the commissioner to conclude that this action of the

company constituted a lockout, it must be found that such was its real purpose.

There is error, the judgment is set aside and the case is remanded for the rendition of a judgment returning it to the unemployment commissioner for a rehearing and a finding of facts and an award in accordance with this opinion.

In this opinion the other judges concurred.