Cheshire
No. 6882

KAZ GORECKI

v.

STATE OF NEW HAMPSHIRE & *a.*

March 31, 1975

*Bell & Kennedy* and *Arnold R. Falk (Mr. Falk* orally) for the plaintiffs.

*Edward F. Smith, Andre J. Barbeau,* and *Joseph Stewart (Mr. Stewart* orally) for the defendants New Hampshire Department of Employment Security and White Metal Rolling & Stamping Corp.

LAMPRON, J. Appeal by the New Hampshire Department of Employment Security from a de novo determination by the Superior Court *(Johnson,* J.) that the plaintiff was not disqualified for benefits under RSA 282:4 F (Supp. 1973) because the work stoppage for the four weeks ending November 27 through December 8, 1971, was due solely to a lockout. RSA 282:4 F (3). This was contrary to a decision by the department's appeal tribunal that plaintiff's unemployment was due to an existing labor dispute and not to a lockout. "By order of the Court, without objection, this finding shall apply to all cases of other employees of White Metal; and, hence, in all such cases, it is found that a lockout occurred." The main issue on this appeal is whether the trial court properly found and ruled that plaintiff's unemployment was due solely to a lockout.

White Metal Rolling and Stamping Corp., operated a plant at North Walpole manufacturing aluminum extension ladders and stepladders mostly sold to Sears, Roebuck and Company. It had a labor-management agreement with the United Electrical, Radio and Machine Workers of America for the period October 1, 1968, to midnight September 30, 1971. This contract was to continue from year to year unless either party gave a written notice of its desire to amend or terminate. Plaintiff, a member of the union, had been employed by the company for a number of years.

On July 26, 1971, the union notified the company of its desire to modify the existing agreement. Accordingly on and after August 24, 1971, the parties entered into negotiations. After September 30, 1971, when their agreement expired, the employees, with the consent of the company, continued to work under its terms on a day-to-day basis. On November 11, 1971, the company gave the union a written notice that the "contract was to terminate five

days from today". Negotiations were held on November 18 and 19 and a company proposal finalized at 1:00 a.m. on the 19th was submitted to the union membership at 8:00 a.m. that same day and rejected. The union members with the assent of the plant manager returned to work at 9:30 a.m. that same morning. In that afternoon the company posted a notice on the plant bulletin board that 35 employees, including the plaintiff, were laid off effective the next day, Saturday November 20, 1971. Negotiations continued, however, and an agreement was reached on December 10, signed on December 17, and the employees went back to work December 20, 1971.

RSA 282:4 (Supp. 1973) reads in part as follows: "An individual shall be disqualified for benefits . . . F. For any week with respect to which the commission finds that total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory . . . provided that this subsection will not apply if it is shown to the satisfaction of the commissioner that . . . (3) The stoppage of work was due solely to a lockout . . . ."

A "labor dispute" is not defined in the statute. It is generally held to encompass "a situation involving any controversy concerning wages, hours, working conditions, or broadly speaking 'any controversy arising out of the respective interests of employer and employee . . . .'" *Furber v. Administrator Unemployment Comp. Act,* 164 Conn. 446, 455, 324 A.2d 254, 259 (1973); *Amory Worsted Mills v. Riley,* 96 N.H. 162, 164, 71 A.2d 788, 790 (1950). It is clear that a labor dispute existed during the four weeks plaintiff was unemployed and for which he is seeking compensation. Such unemployment if caused by the labor dispute is generally considered voluntary and not within the purpose of an unemployment compensation act intended to provide some measure of relief against involuntary unemployment. *Armstrong v. Adams,* 113 N.H. 367, 369, 308 A.2d 842, 843 (1973). The relative merits of the labor dispute are immaterial. *Almada v. Administrator Unemployment Comp.,* 137 Conn. 380, 386, 77 A.2d 765, 769 (1951). If the dispute caused the unemployment, the employee is disqualified from receiving benefits. *Febbi v. Board of Review, Div. of Employ. Sec.,* 35 N.J. 601, 608, 174 A.2d 481, 485 (1961).

However, in this case plaintiff claimed, and had the burden of proving, that his unemployment resulted, not from a labor dispute, but from "a stoppage of work . . . due solely to a lockout" which would prevent his disqualification for compensation. RSA 282:4

F (3) (Supp. 1973); *Amory Worsted Mills v. Riley, supra* at 166, 71 A.2d at 791 (1950). A lockout has been defined as a withholding or cessation of furnishing work by an employer to his employees in order to gain a concession from them. *Be-Mac Transp. Co., Inc. v. Grabiec,* 20 Ill. App. 3d 345, 351, 314 N.E.2d 242, 246-47 (1974); Restatement of Torts § 787, Comment *a* (1939).

There was uncontradicted evidence that during all the negotiations, including November 19, 1971, when the plaintiff and others were laid off, there was never any picketing, threat of strike, strike or slow down. There was no evidence that the employees were not bargaining in good faith or that they were working at other than normal efficiency. *See City Pattern & F. Co. v. Review Bd. of Ind. Emp. Sec. Div.,* 147 Ind. App. 636, 645, 263 N.E.2d 218, 224 (1970). The record shows that they were willing to work under the terms of the expired contract during the negotiating.

The plant manager testified that the plant production for Sears, Roebuck and Company was under 6-month contracts resulting from quotations at a fixed price which was at "a very tight profit margin". He gave as the reason for the "lay-off" notice of November 19, 1971, the long negotiations with the union which prevented the company from submitting quotations to Sears. Without their contracts there would be no work for the employees.

The manager admitted, however, that the material constituted the major cost factor of the product. There was evidence that the company was working on a contract with Sears dated July 27, 1971, on which deliveries were to be made from August 1, 1971, to March 31, 1972. The company had also received a request in March or April 1971 for quotations on a new contract with deliveries to start December 1, 1971, and end June 30, 1972. Such a contract dated November 23, 1971, was executed. However, the manager testified it was not sent to Sears until December 15, 1971, together with a covering letter. This letter was not produced and the manager testified it would not be normal to execute such a contract on December 15, 1971, and date it back "but it was possible."

There was also evidence that the majority of the prices quoted in this contract were the same and some apparently lower than those in the preceding agreement. The new labor agreement between the parties which became effective on December 20, 1971, was not signed until December 17 of that year. This was some weeks after the date of the Sears contract. Lastly there was evidence that: "In a couple points during the negotiations . . . [the company attorney] indicated that . . . [the union] didn't know how to negotiate

124

and we should accept what he was offering and perhaps we'd negotiate better from the street."

We hold on the record that the trial court properly found and ruled that plaintiff's unemployment was due solely to a lockout by the company and that he qualified for compensation.

*Appeal dismissed.*

All concurred.