291 S.E.2d 477

### LEE–NORSE COMPANY

v.

### Phyllis J. RUTLEDGE, Clerk, etc., Billy D. Carter, et al., Board of Review of the W. Va. Dept. of Employment Security, et al.

### No. 15007.

Supreme Court of Appeals of West Virginia.

May 18, 1982.

---

Huddleston, Bolen, Beatty, Porter & Copen, William C. Beatty and Thomas J. Murray, Huntington, for petitioner.

McIntyre, Haviland & Jordan, James B. McIntyre and James M. Haviland, Charleston, for respondents.

HARSHBARGER, Justice:

Billy Carter and the other appellees are members of Teamsters Local 175 and employees of Lee-Norse Company, a Raleigh County manufacturer of underground mining equipment. In January, 1979, their contract expired, and while collective bargaining for a new contract was proceeding but before agreement had been reached, Lee-Norse locked its gates to union members. The employer asserted that it was a protective lockout, that its business could not continue while there was uncertainty about whether a strike was coming. There was no strike, and the union members had offered to work.

Workers applied for unemployment compensation but were held to be disqualified from getting it: W.Va.Code, 21A–6–3(4) denies benefits when "unemployment is due to a stoppage of work which exists because of a labor dispute." The Board of Review of the West Virginia Department of Employment Security affirmed, but Kanawha County Circuit Judge Robert Smith reversed the Board.

Both parties agree that there was a work stoppage within the meaning of Code, 21A–

6–3(4)[1] and *Cumberland and Allegheny Gas Company v. Hatcher*, 147 W.Va. 630, 130 S.E.2d 115 (1963). The question is whether it was "caused by" or "because of" a labor dispute. *See Davis v. Hix*, 140 W.Va. 398, 84 S.E.2d 404 (1954), Syllabus Point 12.

In *Hill v. Board of Review*, 166 W.Va. 648, 276 S.E.2d 805 (1981), we recognized that the cause of a work stoppage was important in deciding whether employees were disqualified from benefits. There was a fire at the mine while *Hill* claimants were on strike. Work could not proceed until damages were repaired, and during that time there was no picketing. We found that the work stoppage was a result of fire damage, not a labor dispute.

Other states have analyzed work stoppages during labor disputes, interpreting their unemployment compensation statutes.[2] In *Sweeney v. Board of Review, Division of Employment Security, De-partment of Labor and Industry*, 43 N.J. 535, 206 A.2d 345, 348 (1965), the New Jersey Supreme Court wrote:

> *If the employer refuses to provide work for an employee upon any terms*, then, although a strike or lockout may ensue, it cannot be said as to that employee that his unemployment or the work stoppage is attributable to the dispute. (Emphasis added.)

Stoppages caused by management-perceived adverse economic conditions, fears of strikes and consequent reduced orders during contract negotiations have not justified findings that lockouts were "because of" labor disputes.[3] *See generally Department of Industrial Relations v. Nix*, Ala. Civ.App., 381 So.2d 651 (1980); *Gulf Atlantic Warehouse Co. v. Bennett*, 36 Ala.App. 33, 51 So.2d 544 (1951); *Brechu v. Rapid Transit Co.*, 20 Conn.Sup. 209, 131 A.2d 211 (1957); *Gorecki v. State*, 115 N.H. 120, 335 A.2d 647 (1975); *Zura v. Marblehead*

1. W.Va.Code, 21A–6–3(4):

   "For a week in which his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he was last employed, unless the commissioner is satisfied that he was not (one) participating, financing, or directly interested in such dispute, and (two) did not belong to a grade or class of workers who were participating, financing, or directly interested in the labor dispute which resulted in the stoppage of work. No disqualification under this subdivision shall be imposed if the employees are required to accept wages, hours or conditions of employment substantially less favorable than those prevailing for similar work in the locality, or if employees are denied the right of collective bargaining under generally prevailing conditions, or if an employer shuts down his plant or operation or dismisses his employees in order to force wage reduction, changes in hours or working conditions.

   "For the purpose of this subdivision, if any stoppage of work continues longer than four weeks after the termination of the labor dispute which caused stoppage of work, there shall be a rebuttable presumption that that part of the stoppage of work which exists after said period of four weeks after the termination of said labor dispute did not exist because of said labor dispute; and in such event the burden shall be upon the employer or other interested party to show otherwise."

2. We cite the reader to a series of excellent annotations by Thomas Goger in A.L.R.3d: Annot., General Principles Pertaining To Statutory Disqualification for Unemployment Compensation Benefits Because of Strike or Labor Dispute, 63 A.L.R.3d 88 (1975 and Supp.); Annot., Unemployment Compensation: Application of Labor Dispute Disqualification for Benefits to Locked Out Employee, 62 A.L.R.3d 437 (1975 and Supp.); Annot., Construction of Phrase "Stoppage of Work" in Statutory Provision Denying Unemployment Compensation Benefits During Stoppage Resulting From Labor Dispute, 61 A.L.R.3d 693 (1975 and Supp.).

3. It may even be improper to call those kinds of work stoppages lockouts. A most frequently cited definition of lockout is found in *Magner v. Kinney*, 141 Neb. 122, 2 N.W.2d 689 (1942), Syllabus Point 1:

   " 'A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms.' *Iron Molders' Union v. Allis-Chalmers Co.*, 7 Cir., 166 F. 45, 20 L.R.A., N.S., 315."

   *See also Almada v. Administrator, Unemployment Compensation Act*, 137 Conn. 380, 77 A.2d 765, 770 (1951); *Detroit Harvester Co. v. Kentucky Unemployment Insurance Commission*, 343 S.W.2d 365, 367 (Ky.1961); *Gorecki v. State*, 115 N.H. 120, 123, 335 A.2d 647, 649 (1975); *Zanesville Rapid Transit, Inc. v. Bailey*, 168 Ohio St. 351, 354, 155 N.E.2d 202, 205 (1958).

   Stoppages caused by economic conditions do not fit this definition.

*Stone Division, Standard Slag Corporation*, 13 Ohio Misc. 317, 42 Ohio Ops.2d 15, 224 N.E.2d 176 (1965); *Gladieux Food Services, Inc. v. Unemployment Compensation Board of Review*, 479 Pa. 324, 388 A.2d 678 (1978); *Kansas City Star Co., Flambeau Paper Co. Div. v. Department of Industry, Labor and Human Relations*, 60 Wis.2d 591, 211 N.W.2d 488 (1973), *reh. denied*, 62 Wis.2d 783, 217 N.W.2d 666, *cert. denied*, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 105. *But see Department of Industrial Relations v. Walker*, 268 Ala. 507, 109 So.2d 135 (1959); *Doerr v. Universal Engineering Division, Houdaille Industries, Inc.*, 410 Mich. 231, 301 N.W.2d 285 (1981); *Mortensen v. Board of Review, Division of Employment Security, New Jersey Department of Labor and Industry*, 21 N.J. 242, 121 A.2d 539 (1956).

Lee-Norse's Personnel and Industrial Relations Manager testified:

A. We decided that the only thing that we could do after presenting this offer and learning of this rejection, would be that we would have to institute a protective lock out.

Q. Alright, now why did you decide that you would need a protective lock out?

A. Under the proposal that the union had given us, there was no guarantee that they would work for any specific length of time, due to the requirements of our business that is, we would not be able to accept a customers [sic] order for example and say to him we will deliver your order on such and such a date, we would be unable to do that if we didn't know that we were going to have a work force there to build that product. Uh ... another reason would be the fact that so many of our parts that we use to build our machinery has to be ordered sometimes 240 to 280 days in advance, and unless we knew that we were going to have a work force there in our plant capable of assembling these parts and filling our customers orders, there is no way we could accept that kind of a proposal from the union.

This proves a purely business, economic motivation for Lee-Norse's decision: it locked its gates because of uncertainty about employer-customer relations should negotiations at some future point reach an impasse.

This Court has previously decided:

"A stoppage of work" which exists because of a labor dispute, within the meaning of the unemployment compensation statutes of this state, may result either from a strike on the part of the employees or from a lockout on the part of the employer. *Cumberland and Allegheny Gas Company v. Hatcher, supra* 130 S.E.2d, Syllabus Point 1.

We conclude that this Syllabus Point is wrong and inconsistent with the statutory purpose. In addition, we find that Syllabus Point 2 of *Miners In General Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), which was distinguished in *Davis v. Hix, supra*, at Syllabus Point 4, does not accurately state the law:

Where there is an existing contract between a group of employers and their employees, covering wages, terms, and conditions of employment, which is about to expire, negotiations in respect to entering into a new contract, or the continuance or modification of the old, in which differences of opinion arise, and there is a failure to agree thereon, from which disagreement unemployment results, a labor dispute is thereby created, within the meaning of subsection 4 of Section 4, Article 6, of Chapter 1, Acts of the Legislature, Second Extraordinary Session, 1936, and employees involved in such dispute, under the terms of said act, and unemployed by reason thereof, are not entitled to receive unemployment benefits thereunder. *Miners In General Group v. Hix, supra*, at Syllabus Point 2.

The point of law above was too broadly worded and overinclusive. Rather than clarify matters, it only complicated analysis. We cite Judge Lovins' articulate dissent in that case, 123 W.Va. at 658–666, 17

S.E.2d at pp. 821–824. He concluded that a work stoppage due to failure to reach an agreement, when parties are negotiating, is not due to a labor dispute.

■ We find that when a contract has expired, and there has been no new agreement, there is not created thereby a disqualifying "dispute" per Code, 21A–6–3(4).

Our interpretation is aided by rules of statutory construction and by our Legislature's announced purposes of our unemployment compensation act:

> [T]o provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment. In the furtherance of this objective, the legislature establishes a complusory system of unemployment reserves in order to:
>
> (1) Provide a measure of security to the families of unemployed persons.
>
> (2) Guard against the menace to health, morals and welfare arising from unemployment.
>
> (3) Maintain as great purchasing power as possible, with a view to sustaining the economic system during periods of economic depression.
>
> (4) Stimulate stability of employment as a requisite of social and economic security.
>
> (5) Allay and prevent the debilitating consequences of poor relief assistance. W.Va.Code, 21A–1–1.

"The primary purpose of the Unemployment Compensation Law is not to regulate or control the relationship of employer and employee, but to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment ...." *Homer Laughlin China Co. v. Hix*, 128 W.Va. 613, 37 S.E.2d 649, 655–656 (1946).

■ We are instructed to give proper weight and consideration to these benign purposes promoting public good and the general welfare. *Davis v. Hix, supra,* 140 W.Va. at 420, 84 S.E.2d, at 417. "Compensation Acts, being highly remedial in char-

acter, though in derogation of the common law, should be liberally and broadly construed to effect their beneficent purpose." *Sole v. Kindelberger,* 91 W.Va. 603, 114 S.E. 151, 153 (1922). We consistently apply a liberality rule in workmen's compensation cases. *Zackery v. State Workmen's Compensation Commission,* 162 W.Va. 932, 253 S.E.2d 532 (1979); *Johnson v. State Workmen's Compensation Commission,* 155 W.Va. 624, 186 S.E.2d 771 (1972); *Morris v. State Compensation Commissioner,* 135 W.Va. 425, 64 S.E.2d 496 (1951); *McVey v. Chesapeake & Potomac Telephone Co.,* 103 W.Va. 519, 138 S.E. 97 (1927). We discussed liberal construction of our unemployment statute in *Davis v. Hix, supra,* 140 W.Va. at 420, 84 S.E.2d at 417:

> Thus, the Act is not only remedial in its nature, but its purpose is to conserve the public good and preserve the general welfare.
>
> Upon this question, the following quotations are from Vol. II, Lewis' Sutherland Statutory Construction, Second Edition: Sec. 582: "The law favors a liberal construction of certain statutes to give them the most beneficial operation. * * * Two classes of statutes are liberally construed—remedial statutes, and statutes which concern the public good or the general welfare." Sec. 589: "The modern doctrine is that to construe a statute liberally or according to its equity is nothing more than to give effect to it according to the intention of the lawmaker, as indicated by its terms and purposes. This construction may be carried beyond the natural import of the words when essential to answer the evident purpose of the act; so it may restrain the general words to exclude a case not within that purpose." Sec. 590: "Where the intent of the act is manifest, particular words may have an effect quite beyond their natural signification in aid of that intent."

We concluded by making this a syllabus point:

> Unemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent

thereof. *Davis v. Hix, supra,* Syllabus Point 6.

As early as 1941, we recognized that the Act is designed to compensate individuals who are *involuntarily* unemployed: "The assessments made to build up a fund to take care of benefits to which workers would be entitled, when unemployed, must be assumed to have been created on the idea of *involuntary unemployment.*" *Miners In General Group v. Hix, supra,* 123 W.Va. at 646, 17 S.E.2d at 815. (Emphasis added.)

Involuntary means "without will or power of choice", Black's Law Dictionary, Fifth Edition (1979); "done contrary to or without choice," Webster's New Collegiate Dictionary (1976). The purposes of the Act are only served when an available and willing worker who, against his will and contrary to his choice, is compelled to leave his employment, receives compensation.

Workers who withhold their labor in disputes with their employers to acquire greater benefits (in other words, who strike), make a conscientious choice that the loss of wages during a strike is worth any potential benefits they hope to gain. Theirs is a calculated risk, but it is voluntary. Even workers who are "forced" or "compelled" to strike because their "wages, hours or conditions of employment [are] substantially less favorable than those prevailing for similar work in the locality", or "are denied the right of collective bargaining", or are locked out "in order to force wage reduction, changes in hours or working conditions", Code, 21A–6–3(4), are protected from loss of unemployment compensation benefits: their behavior is deemed "involuntary" and they are not disqualified.[4]

It is perfectly legal for an employer to contend for lower wages and less favorable working conditions than his employees' bargaining agent is willing to accept and (in circumstances defined by federal statutes and decisions) he may even close his plant to attempt to coerce his employees into accepting his terms. But he cannot use the Employment Security Act to further his cause. *If he closes his plant while his employees are still bargaining in good faith, are working at normal efficiency and with normal attendance, and are willing to continue working while negotiating, he cannot successfully demand that his employees be denied benefits.* Conversely, employees cannot draw benefits during a work stoppage their intransigeance has contributed to creating, even though, otherwise, they may have a perfect right to refuse to yield to their employer's demands. *City Pattern and Foundry Co. v. Review Board,* 147 Ind.App. 636, 263 N.E.2d 218, 224 (1970). (Emphasis added).

We are further guided by the wisdom and rationale of the Louisiana and Montana Supreme Courts and Michigan's Court of Appeals.[5] Louisiana's Unemployment

---

**4.** The Indiana courts have taken an interesting approach to lockouts, labor disputes, and unemployment compensation. In *Bootz Mfg. Co. v. Review Board,* 143 Ind.App. 17, 237 N.E.2d 597, *reh. denied,* 143 Ind.App. 111, 238 N.E.2d 472 (1968), a unilateral employer lockout, while negotiations were fluid and had not reached impasse, was not a "labor dispute" for purposes of unemployment compensation benefit disqualification. Following that precedent, the court noted in *City Pattern and Foundry Co. v. Review Board,* 147 Ind.App. 636, 263 N.E.2d 218 (1970), that lockouts were legal labor-management tools but could not be used to deny workers benefits. Finally, *Gold Bond Building Products Division National Gypsum Company, Shoals Plant v. Review Board,* 169 Ind.App. 478, 349 N.E.2d 258, 265 (1976), concluded: [W]here there is no impasse and where, as here and in *Bootz* and *Int'l. Steel* [*Co. v. Review Board,* 149 Ind.App. 137, 252 N.E.2d 848 (1969) ], there *is* a finding to the effect that the Union "agreed to operate on a day-to-day basis and all its members continued to appear for work with no evidence of any slowdown in production ...", a finding of "no strike threat" is not necessary to permit the inference that the claimants were unemployed through no fault of their own." Therefore, in Indiana, a strike "threat" while negotiations are fluid and the union is working on a day-to-day basis, is not a disqualifying labor dispute.

**5.** Two Michigan Court of Appeals decisions follow the logic of *National Gypsum Company, supra,* and agree with our decision today: *Smith v. Michigan Employment Security Commission,* 89 Mich.App. 212, 280 N.W.2d 489 (1979); *Doerr v. Universal Engineering Division, Houdaille Industries, Inc.,* 90 Mich.App. 455, 282 N.W.2d 352

Compensation Act is like ours in that it disqualifies workers whose unemployment is caused by labor disputes.[6] In *National Gypsum Company v. Administrator, Louisiana Department of Employment Security*, La., 313 So.2d 230, 232–234 (1975), *appeal dismissed*, 423 U.S. 1009, 96 S.Ct. 439, 46 L.Ed.2d 381, Justice Tate reasoned that the labor dispute disqualification did not apply to locked out employees:

> Thus unemployment compensation is not paid primarily to reward the employee nor to punish the employer, but rather to protect the stability of the state and of the family, by relieving the family distress and the menace to the public welfare occasioned through unemployment of individual workers.

> .　　.　　.　　.　　.

> [W]e think the more reasonable interpretation of the disqualification to be that unemployment due to a "labor dispute in active progress" includes only unemployment resulting from labor disputes in which the employee himself actively engages by refusing to work....

> .　　.　　.　　.　　.

> Similarly, our interpretation today prevents the disqualification from being used as a weapon to enforce a lock-out. The State should be neutral in labor disputes, and it should not encourage resort to aggressive measures in derogation of peaceful negotiation at the bargaining tables.

Montana also studied its legislative purpose and determined that its labor dispute disqualification did not apply to locked-out employees. Justice Haswell wrote for a unanimous court:

> The respondents contend that they were not participants in the lockout, they were victims of it. In reviewing the negotiations prior to the lockout, it is apparent that the employees had not threatened the employer with a strike or a work slowdown. The lockout was not brought on by the action of the employees except for the fact that they voted to reject the employer's last offer. It appears as though no demands had been made except for those ordinarily incident to any negotiating procedure. There was no testimony that a strike vote had ever been taken or was even contemplated by the employees. The employees' representative unions were willing to continue negotiations and so informed the employer prior to the lockout.

> ... It would be difficult for reasonable minds to reach the conclusion that the lockout was precipitated by the union or the employees in view of the fact that the unions' attitude was that of negotiating any differences which the employees had through the collective bargaining process and the action of the employees seeking to return to work and being refused employment by the employer. The employees involved were unemployed through no fault of their own. *Montana Ready Mixed Concrete Association v. Board of Labor Appeals*, 175 Mont. 143, 572 P.2d 915, 919 (1977).

California has devised a "volitional" test for its labor dispute unemployment disqualification. *Bodinson Manufacturing Company v. California Employment Commission*, 17 Cal.2d 321, 109 P.2d 935 (1941). The Pennsylvania courts determine the party whose action constituted the final cause of work stoppage and assess responsibility against that party. *Borello v. Commonwealth Unemployment Compensation Board of Review*, 490 Pa. 607, 417 A.2d 205 (1980); *Vrotney Unemployment Compensation Case*, 400 Pa. 444–445, 163 A.2d 91, 93 (1960).

(1979). These cases were recently reversed in *Smith v. Michigan Employment Security Commission*, 410 Mich. 231, 301 N.W.2d 285 (1981). We believe Judge Moody's dissent, 301 N.W.2d at 298, and the Court of Appeals' opinions are more persuasive for interpreting our Act.

**6.** Several states have unemployment statutes that disqualify claimants unemployed because of labor disputes, but specifically exclude lockouts from the disqualification. Arkansas-Ark. Stat.Ann. § 81–1105(f) [Repl.1976]; Connecticut-General Statutes, § 7508; Kentucky-KRS 341.360; Maryland-Maryland Code, (1957, 1969 Repl.Vol., Cum.Supp.) Art. 95A, 6(e); New Hampshire-R.S.A. 282:4 subd. F(3) (Supp.1975); Ohio-R.C. 4141.29(D)(1)(a); Pennsylvania-43 P.S. § 802(d).

We find that a lockout is not necessarily disqualifying, and overrule any inconsistent language in Syllabus Point 1 of *Cumberland and Allegheny Gas Company v. Hatcher,* 147 W.Va. 630, 130 S.E.2d 115 (1963). In addition, we find that Code, 21A–6–3(4) was not intended to disqualify workers who were locked out during contract negotiations if they were willing to work on a day-to-day basis. We overrule Syllabus Point 2 of *Miners In General Group v. Hix, supra.*

The trial court is affirmed and benefits are granted to each of these claimants who are otherwise eligible within the statutory scheme.

Affirmed.