Department of Employment Security
No. 87-179

## APPEAL OF SIMPLEX WIRE & CABLE COMPANY, INC.
### (New Hampshire Department of Employment Security)

October 31, 1988

*Fisher & Phillips*, of Atlanta, Georgia, and *Aeschliman & Tober*, of Portsmouth (*Charles Kelso* and *Stephen L. Tober* on the brief, and *Mr. Kelso* orally), for the plaintiff.

*Nathan S. Paven & Associates*, of Quincy, Massachusetts, and *McNeill, Taylor & Dolan*, of Dover (*James F. Norton* and *Judith E. Hotham* on the brief, and *Mr. Norton* orally), for the defendants Lloyd E. Brewer, Raymond Gagne & a.

*Stephen E. Merrill*, attorney general (*David S. Peck*, assistant attorney general, on the brief and orally), for the State.

SOUTER, J. Simplex Wire and Cable Company, Inc. appeals from a decision of the appellate division of the department of employment security (DES), RSA 282-A:62, affirming an award of unemployment compensation benefits on the theory that, upon the expiration of a collective bargaining agreement, Simplex effected a constructive lockout by offering continued employment only on

terms that the employees could not reasonably accept. *See* RSA 282-A:36, II-a. We reverse.

The unionized employees at Simplex's Portsmouth factory are represented by the International Brotherhood of Electrical Workers Local 2208, with which the company had a collective bargaining agreement that expired on July 31, 1986. Despite eleven bargaining sessions over a period of three months, Simplex and the union failed to negotiate a new agreement prior to the expiration date, and about 6:00 p.m. on July 30, the company caused all union members to be escorted from the factory in order, as it claimed, to prevent pre-strike sabotage. The company paid for all work scheduled to be done that day and the next, the final day of the contract period. The employees also stayed out on Friday, August 1, in accordance with a prior agreement between the union and the company that employees would take an excused, unpaid absence that day, so that the union members could meet to vote on the latest contract proposal.

Company and union representatives also had a meeting that Friday afternoon, at which the union officials announced that the members had rejected the company's proposal and had authorized the union to call a strike if and when necessary. The union officials advised, however, that they were authorized to continue negotiating and that the members were prepared to continue working. The company spokesmen replied that because of the preparations then in effect for an anticipated strike, they could not reopen the plant until the following Monday, at which time the company intended to implement the provisions contained in its latest offer. The two sides agreed to meet on Monday, August 4, to schedule the resumption of work, to plan meetings for orienting employees on the new employment terms, and to work out other matters affecting the resumption of manufacturing. When union members who would normally have worked on the weekend reported for work Saturday and Sunday, they were not admitted to the plant, and on Sunday the company began to run help-wanted ads, for hiring replacements "in the event of a possible strike."

When the parties met on Monday at 1:00 p.m., the company agreed that union members could return to their jobs starting at midnight and could work at their shifts through 6:00 p.m. the following Thursday. At that time, each employee would be expected to attend a meeting for instruction on the company's new employment terms and on the work assignments to be in effect until a new collective bargaining agreement might be reached.

As the company representatives explained, the core of the employment terms was taken from the company's most recent contract proposal, under which wage rates would not decrease from those previously in effect. In fact, wages would increase in some cases, although in others a change in policy to give temporary employees first preference when assigning overtime work could cause a decrease in total wages earned. Job classifications would be modified, and job assignments could be changed. Until a new agreement should be reached, movement within the plant would be restricted and employees would be subject to escort by security officers. Since the company would not have the benefit of a no-strike clause, the employees would have no grievance rights, and acts of insubordination or intimidation would result in discharge. Any employee who returned a mailing from Simplex would be subject to discipline or discharge, and there would be no rights to sick or personal days, as there had been under the expired contract.

The union representatives responded to these terms by refusing cooperation, and the company's agents were blunt in expressing the adversarial character of their position. The company proceeded, nonetheless, to recall employees for work beginning with the midnight shift, although that process ended abruptly upon the company's receipt that evening of a telegram from the union announcing that a strike would begin one minute after midnight. The next morning, union pickets began to carry "on strike" signs, and Simplex dropped its reference to the contingency of a strike in its further advertisements recruiting new employees.

In due course, the union members' requests for unemployment compensation led to this proceeding, which focuses upon the State's general statutory policy on compensating the unemployed, and upon its more narrowly tailored policy toward those whose unemployment results from a labor dispute. The general statutory rule restricts unemployment compensation benefits to those whose unemployment is either involuntary and without blame or voluntary but supported by "good cause." RSA 282-A:32, I(a) and (b). *See generally Armstrong v. Adams*, 113 N.H. 367, 369, 308 A.2d 842, 843 (1973). To this policy, the legislature has made an exception by providing that "[a]n individual shall be disqualified for benefits for any week with respect to which the commissioner finds that his . . . unemployment is due to a stoppage of work which exists because of a labor dispute at the . . . establishment . . . at which he is or was last employed." RSA 282-A:36; *see Gorecki v. State*, 115 N.H. 120, 122, 335 A.2d 647, 648 (1975) (unemployment caused by labor dispute generally considered voluntary). This

special rule is itself subject to exceptions, however, under one of which a person unemployed because of a labor dispute is not disqualified for benefits if the "stoppage of work was due solely to a lockout or the failure of the employer to live up to the provision of any agreement or contract of employment entered into between the employer and his employees." *See* RSA 282-A:36, II-a.

The claimants before us in this appeal successfully relied on the lockout exception at each level of the claim procedure. The initial DES certifying officer, *see* RSA 282-A:42, determined that "the work stoppage is due solely to a lockout." On appeal for full evidentiary hearing, an appeal tribunal, *see* RSA 282-A:53, found that Simplex had "first altered the status quo . . . on July 30," despite the employees' willingness to continue work under the terms of the old contract. The tribunal found that the terms Simplex announced on August 4 "would have substantially changed the . . . terms and conditions of employment [and] 'were such that the plaintiffs had no reasonable alternative but to quit work' [with the result that the work stoppage was] due solely to a lockout within the meaning of [RSA 282-A:36,] II-a." (Citation omitted.) On Simplex's further appeal, the DES appellate division, *see* RSA 282-A:62, affirmed, finding that "the events of July 30, 1986, constitute[d] a lockout," and that Simplex's subsequent offer of employment was "a change in . . . rules . . . done unilaterally . . . [as an] attempt to gain a concession from the union. . . ." The division therefore found "that the claimants are out of work as a result of a lockout and are entitled to receive unemployment compensation."

■ Our own review is confined to claims of legal error by the appeal tribunal, except insofar as its record may have been clarified, or appellate issues limited, by the proceedings in the appellate division. *Appeal of Kelly,* 129 N.H. 462, 466, 529 A.2d 935, 937 (1987). Our examination of the record in this case reveals legal error both in statutory interpretation and in clearly erroneous factual conclusions. *See* RSA 282-A:67, V(a) and (d) (Supp. 1987).

■ We begin our review by asking when the lockout is supposed to have begun. From the appeal tribunal's reference to a breach of the status quo as having occurred when the employees were sent home on July 30, we infer that the tribunal probably found that a lockout commenced at that point. If such was the determination, it ignored the fact that Simplex continued to pay wages for July 30 as well as for July 31, even though the employees did not work. This fact is critical to the application of a statute intended to

provide relief from the effects of unemployment, *see Armstrong v. Adams*, 113 N.H. 367, 369, 308 A.2d 842, 843 (1973). We are mindful that for purposes of calculating benefits the statute defines "totally unemployed" by reference to a week in which an individual "performs no services" and "no wages are payable," RSA 282-A:15, II, from which we infer that it would be unreasonable to find unemployment when an employer excuses attendance but nevertheless pays in full in accordance with a contractual obligation.

■■ Friday, August 1 presents different facts, although they do not lead to a different result. While there was no work and no pay, the union had agreed with Simplex that this should be so, since the employees were scheduled to meet that day to vote on acceptance or rejection of Simplex's latest proposal. From the definition of "lockout" employed in our cases, as "a withholding or cessation of furnishing work by an employer to his employees in order to gain a concession from them," *Gorecki v. State*, 115 N.H. 120, 123, 335 A.2d 647, 649 (1975) (citations omitted), it is clear that there is no such thing as a lockout by agreement of both parties to a labor dispute. "Withholding" and "cessation of furnishing" both imply unilateral action, and agreement of both sides that there would be no work could hardly be found as intended to gain a concession from one of them. There was no lockout on August 1.

■ The period covering Saturday, Sunday and Monday, August 2–4, presents yet a further combination of facts. Employees who would otherwise have been working those days were refused employment, Simplex made no payments in lieu of wages, and there was no express advance agreement with the union that this should be the case. Thus, the facts are surely sufficient to satisfy the first element of lockout as a withholding or cessation of furnishing of work. The second element is not so well satisfied, however. The evidence was uncontradicted that Simplex had anticipated a strike at the end of the contract period and had for that reason expected to be disappointed if it planned on any production during the weekend that would follow the union vote. The company's judgment was confirmed by the news on Friday afternoon that a strike had been authorized, though not yet called. The union representatives raised no protest when advised that the plant would stay closed over the weekend, subject to a recall of the work force after the Monday meeting of union and company representatives, and the union's silence confirms the company's assertion that a plant covering an area of seventeen acres is too complex an enterprise to be opened on short notice. We conclude, therefore, that a finder of fact could

not reasonably have inferred that gaining a concession from the union was the company's motivation for the closing, without which motive the company would have acted differently. It may have been that the company hoped a couple of payless days would nudge the employees toward agreement later on, but on the total evidence disclosed by the record this was not enough to elevate an otherwise justified temporary closing, to which the union did not demur, into a lockout.

When we turn, finally, to examine the period after August 4, we immediately confront two facts that oppugn the appeal tribunal's finding of a lockout. On the evening of August 4 the company was calling employees back to work, and the union called a strike. The two facts raise two legal hurdles to the union's position.

First, the statute permitting payment of benefits to locked-out employees applies only when the stoppage of work was due "solely" to a lockout. RSA 282-A:36, II-a. There is a presumption that the word "solely" is there for a reason. *See Blue Mountain Forest Ass'n v. Town of Croydon*, 117 N.H. 365, 372, 373 A.2d 1313, 1317 (1977) (legislature deemed not to waste words). The statute evidently assumes that there may be more than one identifiable cause of a work stoppage in the tense atmosphere of a labor dispute, and its requirement to demonstrate a lockout as the sole cause before benefits may be paid reflects the statutory policy, noted before, of confining benefits to those whose unemployment is involuntary.

Given this clear requirement of sole causation, DES had no option to find that a lockout was the sole cause of the work stoppage, when the union called for the work stoppage as a strike. This point will come as no surprise to the picketers, as a look at the record will indicate. There was testimony that after several weeks of picketing with "on strike," signs, the signs changed to "locked out" after the DES certifying officer awarded benefits on September 8, 1986, based on a finding that the claimants had been locked out. The union understood perfectly that the appeal tribunal could not reasonably find that the work stoppage was caused exclusively by a lockout when the union had called for the stoppage as a strike and continued to maintain expressly that a strike was in progress. The union was right, and the appeal tribunal was wrong as a matter of law.

We assume, moreover, that this error on the issue of sole causation would not have occurred if the appeal tribunal had not also applied an erroneous conception of lockout. The application of *Gorecki*'s definition, as we have quoted it above, calls straightfor-wardly for proof of the employer's withholding or cessation of

furnishing work. A lockout was found in that case when "the company posted a notice on the plant bulletin board that 35 employees, including the plaintiff, were laid off effective the next day," *Gorecki v. State*, 115 N.H. at 122, 335 A.2d at 648. Likewise, in a frequently-cited case following on *Gorecki*'s heels, there were lockouts when "the company notified the plaintiffs that as of . . . April 1 their services would no longer be required" and, after a period of recall, the employees "were again notified their services were no longer required." *McIntire v. State*, 116 N.H. 361, 365, 359 A.2d 619, 622 (1976).

In each instance, the employer's affirmative acts terminated and precluded the employment of a class or group of employees, acts that are a far cry from the company's behavior in this case. The evidence is undisputed that when the union called the strike the company was engaged in recalling employees to show up at the midnight and later shifts. It thus required an effort of some imagination to conclude, as the appellate division did, that the "facts in this case are very similar to the facts in *Gorecki*."

The appeal tribunal nonetheless claimed *Gorecki* as authority on the basis of two theories of constructive lockout. First, the tribunal found that when Simplex stopped the work on July 30, even though it continued to pay the employees, it altered the status quo under the nearly expired collective bargaining agreement. The tribunal concluded that Simplex thereby effected the equivalent of a lockout, under the rule followed in Pennsylvania, that when "the employer refuses to . . . extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits . . . does not apply." *Erie Forge and Steel Corp. v. Unemployment Comp. Bd. of Rev.*, 400 Pa. 440, 445, 163 A.2d 91, 93–94 (1960).

Whatever may be the merits of such a rule, its application is not an option available under existing New Hampshire law. It will be recalled that RSA 282-A:36, II-a provides for lifting the labor-dispute disqualification when the sole cause of a work stoppage is either a lockout or the employer's failure to "live up to the provision of any agreement or contract of employment . . . between the employer and his employees." By so distinguishing lockout from an employer's breach of labor contract, the legislature made it plain that lockout and breach are distinct events for the purpose of applying the statute. Since by definition, therefore, the employer could not be engaging in a lockout merely by violating a labor contract still in force, it would be anomalous to hold that an employer could cause a lockout by declining to follow the

provisions of such a contract after its term had expired. Because that is just what the status quo rule would require, its adoption is not open to us, and it was error for the appeal tribunal to suggest that such a rule might be employed to define "lockout" as a statutory term.

The appeal tribunal's second theory of constructive lockout derives from the holdings of some Connecticut cases, that a lockout may be accomplished "by imposing such terms on [the employees'] continued employment that they could not reasonably be expected to continue to work." *Almada v. Administrator, Unemployment Comp. Act,* 137 Conn. 380, 389, 77 A.2d 765, 771 (1951). The appeal tribunal applied this rule by emphasizing that the core terms on which Simplex offered work on August 4 were the terms of the contract proposal that the union had rejected, which the appeal tribunal found would have changed the terms of employment substantially. The tribunal thus determined what was reasonable by reference to the parties' prior contractual relationship and the course of the bargaining by which they intended to alter and extend that relationship into the future. What was reasonable on this view was a function of the parties' recent collective bargaining history.

■■ This analytical approach is, however, precluded by the law in this jurisdiction that in applying the general labor dispute disqualification, and the lockout exception, "the relative merits of the labor dispute are immaterial." *Gorecki v. State,* 115 N.H. at 122, 335 A.2d at 648 (citing *Almada v. Administrator, Unemployment Comp. Act supra*). For if the relative merits of the dispute are immaterial in applying the statute, then neither DES nor this court can properly condition payment of unemployment compensation on opinions about what the employer should reasonably have offered and the employees should reasonably have accepted. Sophistry can not mask the fact that a judgment about reasonable action within the context of a dispute is a judgment about those possibilities open to the parties that could be thought to have merit. The *Gorecki* court held that such a judgment should play no part in administering the provisions of the compensation scheme relating to labor disputes, and the legislature is understood to have adopted that view by its subsequent recodification and reenactment of the relevant statutory provisions without change, by Laws 1981, 408:3 and Laws 1983, 368:2. *See Tomson v. Ward,* 1 N.H. 9, 12 (1816) (reenactment of statutory text adopts prior statutory interpretation).

The union tries to diminish the force of the policy against allowing DES to take sides in labor disputes by pointing to cases in which DES, and this court on appeal, routinely make and review

judgments about the relative reasonableness of behavior by employers and employees. The union cites, for example, *Appeal of City of Franklin*, 125 N.H. 761, 485 A.2d 295 (1984), in which the benefit determination turned on what was "good cause" for the employee to quit, implying an employer's blameworthy conduct. Cases like *Franklin* are not in point, however. While it is, of course, true that the *Franklin* case does concern the relative merits of parties' conduct, the *Franklin* case did not arise out of a labor dispute. When a claim for compensation does occur in the context of a labor dispute, the object of RSA 282-A:36, as *Gorecki* discerned it in its prior codification, was to review the claim in accordance with a distinct policy, under which neither DES nor this court is empowered to determine which side is being reasonable, and which is not.

The State takes a slightly different tack in pointing out that prior decisions of this court have cited some of the Connecticut cases applying a reasonableness criterion to identify a lockout, and State's counsel suggests that such citations were tantamount to approval. Indeed, as we noted above, the *Gorecki* opinion cited *Almada v. Administrator, Unemployment Comp. Act,* 137 Conn. 380, 77 A.2d 765, for the view that the merits of a labor dispute are immaterial, and *McIntire v. State*, 116 N.H. 361, 366, 359 A.2d 619, 622 (1976) cited a slightly earlier Connecticut case on constructive lockout, *Assif v. Administrator, Unemployment Comp. Act*, 137 Conn. 393, 398, 77 A.2d 772, 775 (1951). *Almada,* however, was not cited for its views on constructive lockout, and *McIntire,* like *Gorecki,* was not a constructive lockout case. Although both the *Gorecki* and *McIntire* courts described the employees' behavior at some length, and the *McIntire* court even called that behavior reasonable, 116 N.H. at 365, 359 A.2d at 622, the reason for doing so was to rule out the possibility that employee behavior had been a cause of work stoppage in addition to the lockout; in neither case was there any suggestion that a lockout could be found to have occurred merely because the employer's terms for continuing employment were not reasonable when judged by reference to the terms previously accepted or rejected by the parties.

██ ██ Although we conclude that the appeal tribunal misconstrued "lockout" in this case, and could not reasonably have found a lockout to have occurred on the evidence before it, we should add that our decision should not be read as wholly precluding application of any concept of constructive lockout. We do not rule out the possibility of finding a lockout if an employer offers continued employment only on terms so unfavorable to

employees that no employer could reasonably expect anyone to accept them, the offer being nothing but a sham. In such a case, the inquiry would look, of course, not to the prior dealings of the employer and employees, but to the spectrum of conditions found in the labor market consisting of all potential employees. The issue would turn not on the reasonableness of the employer's offer judged in light of the prior contract, but on the existence of a reasonable possibility of obtaining employees from any sources on the new terms.

Whether we should adopt such a standard, however, is at best an issue for the future. The union has not argued that Simplex's offer fell outside any such limits of reasonable acceptance, and it could hardly have done so in view of uncontradicted testimony that Simplex paid a higher base wage and more valuable fringe benefits than four other large, non-unionized manufacturers in the same job market.

In view of our conclusion that no lockout could have been found on the evidence before the tribunal, it is unnecessary to consider Simplex's further argument that federal preemption would have barred affirmance of the appeal tribunal's decision.

*Reversed.*

THAYER, J., did not sit; the others concurred.