624 S.E.2d 512

**Virgil T. HELTON, State Tax Commissioner of the State of West Virginia, Petitioner Below, Appellee,**

v.

**REM COMMUNITY OPTIONS, INC., Respondent Below, Appellant.**

**No. 32580.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 14, 2005.

Decided Nov. 17, 2005.

Darrell V. McGraw, Jr., Attorney General, Stephen B. Stockton, Senior Assistant Attorney General, Charleston, for the Appellee.

Jeffrey K. Matherly, Eric L. Calvert, Bowles Rice McDavid Graff & Love, L.L.P., Charleston, for the Appellant.

Charlene Vaughan, Deputy Attorney General, Alva Page, III, Assistant Attorney General, Charleston, for Amicus Curiae, WV Department of Health and Human Resources.

ALBRIGHT, Chief Justice:

Appellant REM Community Options, Inc. ("Options") appeals from the August 24, 2004, order of the Circuit Court of Kanawha County, which reversed a decision by the West Virginia Office of Tax Appeals that had significantly reduced the amount of privilege taxes owed by Options and reinstated the full tax assessment. In challenging the decision reached by the circuit court, Options argues that statutory amendments pertaining to the subject privilege taxes were wrongly applied in a retroactive fashion. Upon our full and careful review of this matter, we find no error and, accordingly, affirm the decision of the lower court.

## I. Factual and Procedural Background

On May 1, 2002, Appellee State Tax Commissioner ("Commissioner") issued an assessment of $2,000,616 against Options for unpaid privilege taxes in connection with its operation of a licensed behavioral health services center.[1] The assessment covered the period of January 1, 1998, through December 31, 2001. As the result of an audit, it was determined that Options had not been paying a privilege tax pursuant to West Virginia Code § 11–13A–3 (1997) (Repl.Vol.2003) on various services that it provided to mentally retarded individuals living in regular community settings.[2] Options takes the position that the services at issue in the assessment were not subject to the privilege tax based on statutory language requiring that behavioral health services be "health care related."[3] *See* W.Va.Code § 11–13A–2(d) (1995) (Repl.Vol. 2003).[4]

Options filed a timely petition for reassessment on June 27, 2002, and following a hearing on the matter, the Office of Tax Appeals issued its decision on November 3, 2003. Based on a determination by the Office of Tax Appeals that only the provision of nursing services, physical examinations, and psychological examinations by Options were subject to the provider tax, the amount of the assessment was substantially reduced to $134,816.27. The Tax Commissioner appealed this ruling to the circuit court and, by decision dated August 24, 2004, the circuit court reversed the Office of Tax Appeals and reinstated the original tax assessment. Through this appeal, Options seeks a reversal of the circuit court's decision.

## II. Standard of Review

 Our reviewing standard for administrative decisions such as the one before us

---

1. Options trains, supports, and supervises staff who provide support services to mentally retarded individuals who live in regular community settings, but require a certain level of assistance to reside in a non-institutional environment.

2. The services at issue that Options provides are governed by Title XIX of the Social Security Act, known as the Mental Retardation Developmental Disability Waiver Program. *See* 42 U.S.C. § 1396 (2000). A state wishing to participate in the Medicaid program is required to comply with Title XIX. Pursuant to the cooperative federal-state program known as Medicaid, funding for such services is obtained based on a formula that authorizes a draw from federal funds, as needed, to pay for the federal share of such services. *See infra* note 11.

3. The types of services administered by Options include transportation; adult companion services; pre-authorized nursing services; day habilitation; community residential habilitation; qualified mental retardation professional services; annual medical exams; comprehensive psychological evaluations; pre-vocational training; in-home oversight, supervision, and monitoring; non-healthcare special projects; service coordination; case management; non-healthcare respite services; and pass-through billing for independent contractors providing non-healthcare respite services.

4. " 'Behavioral health services' means *health care related* services provided by a behavioral health center as defined in section one [§ 27–2A–1], article two-a, chapter twenty-seven of this code or section one [§ 27–9–1], article nine of said chapter." W.Va.Code § 11–13A–2(d)(1).

was set forth in syllabus point two of *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996), in which we explained: "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Because this appeal presents issues involving statutory construction, our review is plenary. *See* Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 466 S.E.2d 424 (1995) (holding that "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review"). With these principles in mind, we proceed to determine whether the lower court committed error by reinstating the entirety of the Tax Commissioner's privilege tax assessment in connection with the various services Options provides.

### III. Discussion

Necessary to our review of this matter is an examination of the subject services at issue with respect to the privilege tax assessment, as well as careful scrutiny of the applicable statutory and regulatory language governing the issue of this tax. We begin with the statute that authorizes the collection of a privilege tax. Under West Virginia Code § 11–13A–3, "an annual privilege tax" is imposed upon various persons or entities, including those engaged "in the business of furnishing certain health care services."[5] *Id.* During the period relevant to the assessment, the definition provided for "persons providing health care items or services" was as follows:

(1) "Behavioral health services" means *health care related* services provided by a behavioral health center as defined in section one [§ 27–2A–1], article two-a, chapter twenty-seven of this code or section one [§ 27–9–1], article nine of said chapter.

(2) "Community care services" means home and community care services furnished by a provider pursuant to an individual plan of care, which also includes senior citizens groups that provide such services, but does not include services of home health agencies.

W.Va.Code § 11–13A–2(d) (1995) (emphasis supplied).

At the core of its challenge to the tax assessment at issue is the argument that the bulk of the taxed services Options provides are not "health care related," as required by the definition of "behavioral health services" that was in effect during the period covering the assessment at issue.[6] *See* W.Va.Code § 11–13A–2(d)(1) (1995).[7] Other than the medical and psychological services that it periodically provides, Options maintains that the other services it provides cannot come within the definition of "behavioral health services." *Id.* Options contends that the remainder of its services—those that are not provided by licensed medical providers—are outside the realm of traditional health care services. Likening the bulk of its services to "babysitting" in nature, Options argues that such services, while necessary to enable its clients to live outside an institutional setting, are not within the reach of the privilege tax at issue.

While this case was on appeal to the circuit court, the Legislature amended the definition of "behavioral health services" to mean:

knowledged during oral argument of this case that they bill Medicaid and receive Medicaid reimbursement for the provision of these services.

7. Note, however, that this definition was substantially amended by the Legislature in 2004. The amendment, which took effect on March 13, 2004, expressly made the statutory revision retroactive to 1993 when the definition of "behavioral health services" was first set forth in this section. *See* W.Va.Code § 11–13A–2(d)(2004).

---

5. The inclusion of the "certain health care services" portion of the Severance and Privilege Tax Act, enacted in 1993, was expressly dedicated to fund the Medicaid State Share Fund. W.Va.Code § 11–13A–3; *see* W.Va.Code § 11–13A–20a(a) (1994) (Repl.Vol.2003) (stating that "[t]he amount of taxes collected under this article from providers of health care items or services ... shall be deposited into the special revenue fund created in the state treasurer's office and known as the medicaid state share fund").

6. Although Options argues that the services at issue are not "health care related," Options ac-

services provided for the care and treatment of persons with mental illness, mental retardation, developmental disabilities or alcohol or drug abuse problems *in an inpatient, residential or outpatient setting, including, but not limited to, habilitative or rehabilitative interventions or services and cooking, cleaning, laundry and personal hygiene services provided for such care:* Provided, That gross receipts derived from providing behavioral health services that are included in the provider's measure of tax under article twenty-seven [§§ 11–27–1 et seq.] of this chapter shall not be include[d] in that provider's measure of tax under this article. The amendment to this definition in the year two thousand four is intended to clarify the intent of the Legislature as to the activities that qualify as behavioral health services, and this clarification shall be applied retrospectively to the effective date of the amendment to this section in which the definition of "behavioral health services" was originally provided as enacted during the first extraordinary session of the Legislature in the year one thousand nine hundred ninety-three.

W.Va.Code § 11–13A–2(d) (2004) (emphasis supplied).

Based on the express retroactive reach of the amended statutory definition of "behavioral services" back to the enactment of the privilege tax in 1993, the circuit court determined that "not only do REM's [Option's] nursing services and physical and psychological examinations fall within behavioral health services, but by definition and current clarification REM's 'at issue services' fall within behavioral health services." In the circuit court's opinion, the 2004 amendment resolved any lingering issue as to whether those services that Options provides that are not traditional health care services fall within the ambit of the behavioral services intended to be taxed by the Legislature.

Options argues strenuously against relying on a retroactive application of the 2004 amendment for resolving the issue of whether the privilege tax can be assessed against the non-traditional health care services it provided during the assessed tax period. Options maintains that by making the statutory amendment effective as of when the statute was first enacted in 1993, the Legislature has clearly exceeded what is deemed acceptable in terms of retroactive application. Rather than being asked to sanction an eleven-year clarification by the Legislature, we note initially that the retroactive reach at issue is only six years. Due to the statute of limitation that governs tax matters, the effective reach of the statutory amendment in the case *sub judice* is 1998—the first year of the assessment at issue.

In considering the issue of retroactivity, we must acknowledge the impact that this Court's decision in *Coordinating Council for Independent Living v. Palmer*, 209 W.Va. 274, 546 S.E.2d 454 (2001), had on the statutory amendment at issue. In *Coordinating Council*, we were asked to determine whether homemaker or case management services were included within the definition provided for "community care services" with regard to imposing the privilege tax on "certain health care services." W.Va.Code §§ 11–13A–2(d); –13A–3. Finding a noticeable "lack of clarity as to the precise nature of 'community care services'" and applying the principle of statutory construction which recognizes that the inclusion of one is the exclusion of the others, we held that the privilege tax levied upon "certain health care services" did not apply to homemaker or case management services. 209 W.Va. at 282–83, 546 S.E.2d at 462–63. Given this ruling, we expressly prohibited further taxation of such services until "further clarification by the Legislature." *Id.* at 283, 546 S.E.2d at 463. Following our holding in *Coordinating Council*, the Legislature removed the term "community care services" from those "health care services" subject to the privilege tax at issue. *See* W.Va.Code § 11–13A–3 (2002). Importantly, the services at issue provided by Options were taxed based on their inclusion within the definitional ambit of "behavioral health services," rather than "community care services." [8]

8. When the Legislature amended West Virginia Code § 11–13A–2(d) in 2004 and clarified the

definition of "behavioral health services," the

■ Before discussing the issue of retroactivity, however, we wish to examine whether the privilege tax, as the Tax Commissioner asserts, was properly assessed prior to the statutory amendment in 2004. As with all matters of statutory construction, our objective is to "afford the statute a construction that is consistent with the Legislature's intent." *Coordinating Council,* 209 W.Va. at 281, 546 S.E.2d at 461. As we recognized in syllabus point one of *Smith v. State Workmen's Compensation Commissioner,* 159 W.Va. 108, 219 S.E.2d 361 (1975): "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Consequently, our analysis of the legislative intent underlying the privilege tax at issue requires a careful examination of the statutory language authorizing the imposition of the tax, as well as the basis for the enactment under consideration.

As previously set forth, the authorizing statute provides for the imposition of the privilege tax on businesses "furnishing certain health care services." W.Va.Code § 11–13A–3(a). During the period pertinent to the assessment, the authorizing statute in effect defined "certain health care services" to mean "behavioral health services and community care services." W.Va.Code § 11–13A–3(c) (1997).[9] In authorizing this privilege tax, the Legislature was clear that only those "health care services" that fell within the fields of "behavioral health" and "community care" were subject to this tax. As specified above, the Legislature further defined "persons providing health care items or services" in West Virginia Code § 11–13A–2(d) (1995) to include "behavioral health services." The pertinent definition of "behavioral health services" is "health care related services provided by a behavioral health center as defined in section one [§ 27–2A–1], article two-a, chapter twenty-seven of this code or section one [§ 27–9–1], article nine of said chapter." W.Va.Code § 11–13A–2(d) (1995).

Under the original legislative enactment, the Legislature only defined "behavioral health services" in terms of the entities providing qualifying mental health services. The Legislature expressly tied the statutory definition of "behavioral health services" to those centers that are licensed by the state to provide services to the mentally retarded under either West Virginia Code §§ 27–2A–1 (1977) (Repl.Vol.2004) or 27–9–1 (1977) (Repl. Vol.2004). West Virginia Code § 27–2A–1 addresses the operation of comprehensive community mental health-mental retardation centers and West Virginia Code § 27–9–1 requires that a license be obtained by any "hospital, center or institution . . . to provide inpatient, outpatient or other service designed to contribute to the care and treatment of the mentally ill or mentally retarded . . . ." The parties do not dispute that Options operates as a behavioral health center pursuant to licensure under authority of West Virginia Code § 27–9–1.

Notwithstanding its status as a behavioral health center, Options suggests that because the Legislature failed to define the term "health care related services" in defining the "behavioral health services" subject to the privilege tax, the statute is too ambiguous to be applied. Conversely, the Tax Commissioner adopts the same approach this Court took when faced with an undefined statutory term in *Coordinating Council.* See 209 W.Va. at 281–82, 546 S.E.2d at 461–62. Rather than denying any meaning to the enactment at issue, rules of statutory construction require that undefined terms be construed based on the commonly accepted usage of such terms. See Syl. Pt. 1, *Miners in General Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941) (holding that "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used") (*overruled on other grounds*

definition for "community care services" was deleted.

9. Effective June 5, 2002, the Legislature amended the statute to remove "and community care services" from the definitional language of West

Virginia Code § 11–13A–3(c), presumably in response to this Court's decision in *Coordinating Council.* See 209 W.Va. at 282–83, 546 S.E.2d at 462–63 (finding statutory term "community care services" to be vague and undefined).

*by Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982)).

Before reaching its decision below, the administrative law judge opined that "[t]here is nothing in the statute to indicate that the health care related services are intended to be limited to benefitting the physical health of the clients." Following this observation, the administrative law judge proceeded to conclude that the statutory terms "health care related" connoted only the provision of medical services by licensed medical personnel. This conclusion, however, is not supported by the ordinary and accepted meaning of the terminology at issue. The phrase "health care" is defined as "1. the field concerned with the maintenance or restoration of the health of the body or mind; 2. any of the procedures or methods employed in this field." *Random House Webster's Unabridged Dictionary* 882 (2nd ed., 1998). In turn, the term "health" is defined as "the general condition of the body or mind with reference to soundness and vigor." *Id.*

A narrow interpretation of "health care" that limits the meaning of this statutory term to only traditional medical services supplied by licensed medical personnel does not withstand scrutiny. By definition, the concept of "health care" expansively encompasses both physical and mental health, as well as the various procedures or methods employed for the purpose of restoring or maintaining both physical and mental health. *See id.* To conclude, as the administrative law judge did, that only traditional medical services provided by licensed medical personnel were subject to the privilege tax at issue belies both the nature of behavioral health and the basis for the enactment of the privilege tax on such services.

By regulations adopted pursuant to the act which addresses mental illness, West Virginia Code §§ 27–1–1 to 27–17–4, and the licensing statute pertaining to mental health treatment centers, West Virginia Code § 27–9–1, the term "behavioral health services"

was initially defined during the period of time relevant to this matter as:

> Those services intended to help individuals gain or retain the capacity to function adaptively in their environment, to care for themselves and their families, and to be accepted by society. This includes individuals with emotional or mental disorders, alcohol or drug abuse problems, and mental retardation or other developmental disabilities.

W.Va. R. Division of Health 64 § 11–4.4 (1990).[10] We fully recognize that rather than being adopted pursuant to the specific enforcement powers of the Tax Department, this regulation was promulgated pursuant to the Department of Health's authority to govern the licensure and operation of centers providing mental health services. Consequently, we look to this regulatory definition solely for purposes of gaining an understanding of the nature of the services that Options is licensed to provide.

When the term "health care related" is properly viewed in its accepted usage as encompassing both physical and mental health, then the various services that Options provides that enable the recipients of those services to maintain a level of mental health which permits them to reside within the community rather than in an institutional setting are clearly "health care related" services. To conclude otherwise is to deny the necessity and significance of the behavioral health services provided by centers such as Options to the continued viability of non-institutionalized residential life for the recipients of such services. While many of the services that Options provides may initially seem unrelated to the health and well-being of its recipients, there is little question that without these vital services, the affected individuals could not continue to maintain the level of mental health that permits them to reside outside an institutional setting.[11]

An examination of the basis for the privilege tax being imposed on behavioral health

---

10. This definition was revised in 2000 and currently defines "behavioral health services" as "an inpatient, residential or outpatient service for the care and treatment of persons with mental illness, developmental disabilities or sub-

stance abuse." W.Va. R. Division of Health 64 § 11–3.5 (2000).

11. *See supra* note 3.

centers supports the position that the broad range of services provided by such centers were intended to be subject to the tax, rather than the limited scope of only those services provided by licensed medical personnel as maintained by Options. The Legislature expressly dedicated the funds collected from the imposition of the privilege tax on health care items or services to "the special revenue fund created in the state treasurer's office and known as the medicaid state share fund." W.Va.Code § 11–13A–20a(a) (1994) (Repl. Vol.2003). These funds, like those collected pursuant to the health care provider taxes enacted during the same extraordinary legislative session in 2004, are generated for the distinct purpose of generating federal matching funds to draw down Medicaid funds.[12] *See* W.Va.Code §§ 11–27–1 to –37 (1993) (Repl.Vol.2005) (West Virginia Health Care Provider Tax Act of 1993).

The services at issue that Options provides are pursuant to Title XIX of the Social Security Act, also known as the Mental Retardation Developmental Disability Waiver Program. *See* 42 U.S.C. § 1396 (2000). As the Legislature has recognized:

> "While participation by a state in the medicaid program created by Title XIX of the Social Security Act is voluntary, the reality is that states, and particularly this state, have no choice but to participate. The alternative is to deprive indigent citizens and particularly the children of indigent families of basic medical services."

W.Va.Code § 11–27–1(d). Once a state decides to participate in the medicaid program, it is required to comply with the full panoply of federal requirements set forth in Title XIX. An individual's eligibility for the services provided by Options under Title XIX is determined based upon whether that person is eligible to be institutionalized in an intermediate care facility for the mentally retarded.[13]

Under federal law, individuals who are eligible for the Mental Retardation Developmental Disability Waiver Program must receive active treatment. Active treatment is defined as:

> (a) Standard: Active Treatment. (1) Each client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart, that is directed toward -
>
> (i) The acquisition of behaviors necessary for the client to function with as much self determination and independence as possible; and
>
> (ii) The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440 (2004). In its amicus brief, the DHHR argues that absent this active treatment component attached to the federal monies, "individuals would regress and lose any abilities they have to function in an independent manner."

While Options argues against looking to federal law for guidance in determining the meaning of the statutory language at issue, federal law is instructive on two levels. First, it provides an explanation for the origin of the tax at issue. Second, it proves useful in understanding that the variety of services that are offered by Options pursuant to the requirements of Title XIX have as their object the acquisition and maintenance of "behaviors necessary for the client to function with as much . . . independence as possible." 42 C.F.R. § 483.440. It stands to reason that the multiplicity of services provided by Options in its capacity as a behavioral health center are aimed at maintaining the mental health of the recipients of such services for the purpose of allowing such individuals to live outside the restricting confines of an institutional setting.

---

**12.** For a state to draw down federal dollars under the Medicaid program, a state must have its own share of funds which is determined based on a comparison of a state's per capita income to the national average per capita income. Currently, the state's share in connection with operating our state medicaid program is 27.1%.

**13.** One of the sixteen specified health care provider taxes is imposed on intermediate care facilities for the mentally retarded. *See* W.Va.Code § 11–27–11.

After careful examination of both the statutory language and the legislative purpose underlying its enactment, we are compelled to conclude that the term "health care related," as it pertains to the provision of behavioral health services within the meaning of West Virginia Code § 11–13A–2(d) (1995) for purposes of levying the privilege tax upon certain health care providers, broadly encompasses both physical and mental health and all the various services related to maintaining or restoring an individual's physical and/or mental health. Moreover, our review of the legislation at issue further requires the conclusion that the privilege tax imposed under West Virginia Code § 11–13A–3 (1997) upon certain health care providers is not limited in application to behavioral health care services that are provided by licensed medical providers.[14] Accordingly, we conclude that because "health care related" encompasses mental as well as physical health, the broad range of services that are required pursuant to Title XIX by a behavioral health center, such as Options, are properly within the category of services intended to be taxed by the Legislature for the express purpose of generating funding for draw-down purposes of medicaid funding.

Based on our determination that the statutory provision under consideration, as originally enacted in 1993, permitted the assessment of the privilege tax on the services provided by Options, we find it unnecessary to further address whether principles governing retroactive statutory application prevent application of the clarifying language included in the 2004 amendment to West Virginia Code § 11–13A–2(d).[15] Our decision in this case is reached entirely without reference to the 2004 amendment to West Virginia Code § 11–13A–2(d).

Having determined, for reasons differing from the circuit court,[16] that the privilege tax assessment at issue was sustainable, the decision of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

Chief Justice ALBRIGHT delivered the Opinion of the Court.

---

14. Those licensed medical providers are taxed pursuant to express provider taxes set forth in West Virginia Code §§ 11–27–1 to –37 (1993) (Repl.Vol.2005).

15. Having resolved this matter without relying on the 2004 statutory amendments, we do not address the constitutional arguments raised by Options in connection with the retroactive application of the amended statutory language.

16. *See* Syl. Pt. 3, *Barnett v. Wolfolk,* 149 W.Va. 246, 140 S.E.2d 466 (1965) (recognizing that lower court's judgment may be affirmed "when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment").