**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**JANUARY 2019 TERM**

_____

No. 18-0025

_____

**FILED**

**March 21, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**NICOLE L.,**
**Petitioner Below, Petitioner**

**V.**

**STEVEN W.,**
**Respondent Below, Respondent**

_____

**Appeal from the Circuit Court of Harrison County**
**The Honorable Christopher J. McCarthy, Judge**

**Civil Action No. 16-D-225-1**

**REVERSED AND REMANDED**
_____

**Submitted: February 6, 2019**
**Filed: March 21, 2019**

Delby B. Pool
Delby B. Pool & Associates
Clarksburg, West Virginia
Attorney for Petitioner

Debra V. Chafin
Larry W. Chafin
Law Office of Debra V. Chafin, PLLC
Clarksburg, West Virginia
Attorneys for Respondent

**JUSTICE JENKINS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.    "'In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.' Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004)." Syllabus point 1, *Storrie v. Simmons*, 225 W. Va. 317, 693 S.E.2d 70 (2010) (per curiam).

2.    For purposes of the parental relocation statute, West Virginia Code § 48-9-1 *et seq*., "custodial responsibility" includes duties innate to parenthood such as those defined as caretaking functions in West Virginia Code § 48-1-210 (LexisNexis 2015).

3.    Pursuant to West Virginia Code § 48-9-403(d)(1) (LexisNexis 2015), if a parent who is exercising a significant majority of the custodial responsibility for a child proves that a proposed relocation is in good faith for a legitimate purpose, the location of the proposed move will be presumed to be reasonable. To overcome this presumption, the opposing parent must prove that the purpose of the move is substantially achievable without moving or by moving to a location that is substantially less disruptive of the opposing parent's relationship to the child.

**Jenkins, Justice:**

This is an appeal of an order entered December 7, 2017, in the Circuit Court of Harrison County, that affirmed a family court order denying the petition for modification filed by Petitioner Nicole L. ("Mother")[1] which was based on relocation under West Virginia Code § 48-9-403 (LexisNexis 2015). Mother filed the petition seeking to relocate with her children to Kentucky, and Respondent Steven W. ("Father") opposed the relocation. After the family court denied Mother's petition for relocation, she appealed the matter to the circuit court where the denial was upheld. While maintaining that the lower courts properly denied Mother's petition for relocation, Father also set forth two cross-assignments of error,[2] arguing that the family court abused its discretion by failing to grant his motion to dismiss based on Mother's failure to comply with the relocation notice requirements, and that the family court abused its discretion by failing to modify the parenting plan in accordance with Father's proposal. Having considered the briefs submitted on appeal, the appendix record, the parties' oral arguments, and the applicable legal authority, this Court reverses the final order of the Circuit Court of Harrison County, and remands for entry of an order granting Mother's petition for modification and establishing a new parenting plan.

---

[1] It is this Court's customary practice in cases involving sensitive facts to refer to parties by their initials rather than by their given names. *See In re Jeffrey R.L.*, 190 W. Va. 24, 26 n. 1, 435 S.E.2d 162, 164 n. 1 (1993).

[2] *See* W. Va. R. App. P. 10(c)(10)(f) (providing for cross assignments of error by respondents).

## I.

## FACTUAL AND PROCEDURAL HISTORY

The parties were married in Tennessee in March of 2004 and last lived together as husband and wife in Harrison County, West Virginia, in April of 2016. Two children were born of the marriage, a daughter B.W., born in 2010, and a son T.W., born in 2007.

After the parties separated in spring of 2016, mediation took place, and the parties came together to create a parenting plan. Mother was designated the "primary residential parent," and the plan set out the following: Father was to have parenting time with both children every other weekend from Friday after school through Monday morning. The plan also granted Father every Wednesday with son T.W. Per the parenting plan, the parties could agree on additional time if they decided to do so. Mother was to have the remaining time with the children. Additionally, the parties agreed that Mother "did not waive her right to seek a relocation to Kentucky without meeting a burden of a substantial change in circumstances, and the same shall be expressly reserved to her."[3]

Although Mother previously worked in marketing and real estate in Kentucky, she did not have a job outside the home after the parties relocated to West Virginia and had children. For this reason, in November and December of 2016, she

_____

[3] This is a summarized version of the parenting plan. Father also was given additional time at Christmas, while Mother was allotted the entire Thanksgiving break.

2

undertook an extensive search for employment and ultimately accepted a position with a company near Harrison County. By March of 2017, Mother realized that Father was not going to provide adequate assistance with the children as evidenced by the fact that she was required to care for the children during Father's custodial time in addition to being solely responsible for the children's medication and school-related activities.

Mother asserts that she sought to mediate with Father to address these issues, but that he refused because he was not required to attend mediation again until May of 2017. Accordingly, Mother applied for employment in Kentucky because she believed its job market offered higher income and better career opportunities, in addition to being in close proximity to Mother's family and friends who could provide her with support. After an unsuccessful mediation in May of 2017, Mother filed a petition with the family court to modify the parenting plan and to permit her relocation to Kentucky.

On June 22, 2017, the family court held a hearing on Mother's motion for temporary relief. Prior to the hearing, Mother obtained employment in Kentucky for more than double her then-current salary plus valuable medical and retirement benefits; however, Mother could not relocate to Kentucky to begin employment under the residential schedule of the existing parenting plan. As such, the family court modified the parenting plan for the remainder of summer, and further ordered the parties to attend additional mediation. Because of the family court's temporary summer parenting plan,

Mother accepted the Kentucky job, ceased working in West Virginia, and made an offer to purchase a home in Kentucky.

After another failed mediation in July, the family court held a final hearing on Mother's relocation motion on August 3, 2017. Following a review of extensive evidence, such as the children's medical records, a portion of the parties' text messages, and testimony from various witnesses, the family court ultimately denied Mother's petition for relocation.

Based upon the evidence submitted during the hearing, the family court determined that although Mother exercised a significant majority of custodial responsibility for daughter B.W., she did not exercise a significant majority for son T.W.[4] The family court further found that Mother's relocation was not in "good faith for a legitimate purpose" as required by West Virginia Code § 48-9-403(d)(1). Although the family court conceded that Mother's acceptance of employment in Kentucky making substantially more money than at her job in West Virginia appeared to suggest that she was legitimately pursuing a "significantly better employment opportunity in Kentucky[,]"

---

[4] The parenting plan in place at the time of calculation provided that Mother had 228 overnight visits with T.W. and 280 overnight visits with B.W. The lower courts divided the number of overnights by 365 (days in a year). After this calculation, Mother's relative custodial responsibility percentages equated to sixty-three percent (63%) for T.W. and seventy-seven percent (77%) for B.W. Because seventy percent (70%) is the number that constitutes a significant majority under W. Va. Code § 48-9-403(d)(1) (LexisNexis 2015), Mother was deemed to be exercising a significant majority of custodial responsibility for B.W. only.

4

the family court went on to hold that because Mother "made no attempt to obtain more lucrative employment in the North Central West Virginia Area[,]" her focus was on removing herself from Father's immediate area and not on improving her employment.

The family court entered its final order on August 14, 2017, which gave Mother less than twenty-four hours to return to Harrison County so the children could begin school the following day. At that time, Mother did not have a residence in West Virginia for the children and was unemployed, due to having to relocate back to West Virginia, and quit her new Kentucky job. In September of 2017, Mother filed a petition for appeal of the family court's order in the Circuit Court of Harrison County. In November of 2017, the circuit court held a hearing on the appeal, after which it denied her petition for appeal and affirmed the family court's Order denying her petition for modification. It is from this ruling that Mother now appeals.

## II.

### STANDARD OF REVIEW

Mother asks this Court to review the decision by the Circuit Court of Harrison County, denying her petition for appeal and affirming the family court's order denying her petition for modification. Our standard of review of the circuit court's order is well settled:

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact

5

made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*. Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

Syl. pt. 1, *Storrie v. Simmons*, 225 W. Va. 317, 693 S.E.2d 70 (2010) (per curiam) (internal quotation marks omitted). With this standard in mind, we now address the arguments presented.

## III.

## DISCUSSION

Although Mother asserts six separate assignments of error, these issues will be addressed in three distinct sections.[5] Thus, we first address Mother's challenge that the lower courts failed to review the evidence of caretaking functions when addressing each party's percentage of custodial responsibilities. We will then address Mother's assignment of error based upon the circuit court's affirmation of the family court's refusal to allow permanent relocation, and her argument pertaining to the awarding of attorney's fees.

Further, because this case is heavily focused on interpreting the statutory provisions of West Virginia Code § 48-9-1 *et seq.*, we are mindful that "[t]he primary

---

[5] Mother's assignments of errors A, B, C, and D are based on subparts of W. Va. Code § 48-9-403 ("Modification of Parenting Plan – Relocation of a Parent"). As such, we address those four assignments of error under the umbrella of a W. Va. Code § 48-9-403 analysis.

object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). In determining the intent of the Legislature, we "look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). Moreover, statutory construction is necessary to ascertain the meaning of undefined words and phrases. "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners in Gen. Group v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982).

### A. West Virginia Code § 48-9-403

Under West Virginia Code § 48-9-403(c), when parental relocation affects the custodial responsibilities currently being exercised by each parent, the courts will, "if practical, revise the parenting plan so as to both accommodate the relocation and maintain the same proportion of custodial responsibility being exercised by each of the parents." However, if it is not "practical" to maintain the same proportion, then the courts will "modify the parenting plan in accordance with the child's best interests and in accordance

7

with the principles" set forth in in West Virginia Code § 48-9-403(d)(1-4).[6]  Accordingly,

it is well-established that if a parent is

> exercising *a significant majority of the custodial responsibility*
> *for the child* [that parent] should be allowed to relocate with the
> child *so long as that parent shows that the relocation is in good*
> *faith for a legitimate purpose and to a location that is*
> *reasonable in light of the purpose*.  The percentage of custodial
> responsibility that constitutes a significant majority of custodial
> responsibility is seventy percent or more.  A relocation is for a
> legitimate purpose if it is to be close to significant family or
> other support networks [or] . . . to pursue a significant
> employment or educational opportunity.

W. Va. Code § 48-9-403(d)(1) (emphasis added).  If the relocation is found to be in "good

faith for a legitimate purpose and to a location that is reasonable in light of the purpose,"

but no parent has been exercising a significant majority of custodial responsibility, then

"the court shall reallocate custodial responsibility based on the best interest of the child,

taking into account all relevant factors including the effects of the relocation on the child."

*Id.* at § 48-9-403(d)(2).  However, if the court finds the proposed relocation is not in good

faith for a legitimate purpose then

> the court may modify the parenting plan in accordance with the
> child's best interests and the effects of the relocation on the
> child.  Among the modifications the court may consider is a
> reallocation of primary custodial responsibility, effective if and
> when the relocation occurs, but such a reallocation shall not be

---

[6] The introductory language of W. Va. Code § 48-9-403(d) provides in full: "When the relocation constituting changed circumstances under subsection (a) of this section renders it impractical to maintain the same proportion of custodial responsibility as that being exercised by each parent, the court shall modify the parenting plan in accordance with the child's best interests and in accordance with the following principles [set forth in subparts 1-4]."  We will discuss the various subparts of § 48-9-403(d) throughout this opinion in due course with our analysis of each of the parties' arguments and assignments of error.

8

ordered if the relocating parent demonstrates that the child's best interests would be served by the relocation.

*Id.* at § 48-9-403(d)(3).

In light of this framework, we now turn to the facts presented to determine whether the respective lower courts properly applied the provisions of West Virginia Code § 48-9-403 when denying Mother's petition to relocate with her children.

**1. Significant custodial responsibility.** In her appeal, Mother argues that that lower courts erred in failing to review evidence of caretaking functions when determining custodial responsibility. According to our statutory framework, "[i]n determining the proportion of caretaking functions each parent previously performed for the child under the parenting plan before relocation, the court may not consider a division of functions arising from any arrangements made after a relocation but before a modification hearing on the issues related to relocation." W. Va. Code § 48-9-403(e).

Mother contends that the lower courts failed to review the evidence of the proportion of caretaking functions she performed for the two children prior to her relocation, which she asserts was seventy percent (70%) or more. Rather than examine the caretaking functions performed by both parties, the lower courts simply counted overnight visits. Once overnight visits were calculated, it was determined that Mother had the majority of custodial responsibility for the daughter, but not for the son.

9

Father responds that the lower courts properly found that Mother did not exercise the majority of custodial responsibility for their son. According to Father, Mother erroneously contends that courts should apply caretaking functions, as defined by West Virginia Code § 48-1-210, in determining the parties' respective percentages of custodial responsibility. Father explains that if the Legislature intended for courts to consider caretaking functions when calculating custodial responsibility, then it would have been a simple matter for it to make a cross-reference in the Code; yet, it did not do so.

However, after a thorough review of the governing law, we find nothing that states a court can use only overnight visits when calculating custodial responsibility. In fact, the West Virginia Code specifically provides that "custodial responsibility refers to physical custodianship and supervision of a child. It usually includes, *but does not necessarily require*, the exercise of residential or overnight responsibility." W. Va. Code § 48-1-219 (LexisNexis 2015) (emphasis added).

We agree with Mother's contention that the lower courts should have considered caretaking functions when determining the percentage of her custodial responsibility. In analyzing the "significant majority of custodial responsibility" of the two children at issue, the lower courts ignored the clear language of the statute and made contradictory findings based on the wrong criteria. Specifically, the family court relied solely on the number of overnight visits each parent had per the agreed parenting plan because it found that "the West Virginia child support formula is based upon a counting of

10

overnights. . . ." Therefore, the family court "assume[d] that the significant majority calculation should also be based on overnights as there is no statutory guidance nor court decision of record otherwise." However, this reasoning is clearly erroneous. This case has nothing to do with child support, and, as such, clarified guidance is needed as to the determination of custodial responsibility for the purposes of W. Va. Code § 48-9-403.

Here, when counting overnight visits, the lower courts found that Mother exercised a majority of the custodial responsibility for the daughter, but not for the son. However, if the courts had considered the caretaking functions performed by both parties, it would have been evident that Mother exercised the majority of custodial responsibility for both children because she was primarily responsible for the children's education, transportation, medical visits, extracurricular activities, and daily care. At the hearings below, Mother presented several witnesses including school personnel and medical professionals, who all testified to her participation in school events and activities, as well as to issues with Father's failure to administer medications to the children. Mother also testified extensively[7] to instances where she was required to assume Father's responsibilities under the parenting plan, including picking the children up from school on days Father had custody and taking the son to extracurricular activities that Father was

---

[7] In Respondent's Brief, Father did not include any statement of facts or any other section detailing his version of the underlying facts in this matter. Furthermore, Father repeatedly notes in his Brief that many of the facts are "unrebutted" or "uncontested."

scheduled to attend with the child. She also testified to instances where Father refused to care for the children as scheduled.

In its current form, the parental relocation statute provides limited guidance on how to calculate custodial responsibility. In fact, other than stating that seventy percent constitutes a significant majority, the Legislature has never defined the criteria examined when calculating significant custodial responsibility. Nevertheless, we find some guidance in West Virginia Code § 48-9-206 (LexisNexis 2015):

> If the court is unable to allocate custodial responsibility under § 48-9-206(a) of this code because the allocation under § 48-9-206(a) of this code would be harmful to the child, or because there is no history of past performance of *caretaking functions*, as in the case of a newborn, or because the history does not establish a pattern of caretaking sufficiently dispositive of the issues of the case, the court shall allocate *custodial responsibility based on the child's best interest*, taking into account the factors in considerations that are set forth in this section and in § 48-9-209 and § 48-9-403(d) of this code and *preserving to the extent possible this section's priority on the share of past caretaking functions each parent performed.*

(Emphasis added). From this excerpt, it is evident that the Legislature took note of the interconnectedness of custodial responsibility and caretaking functions. As previously noted, in the present case, the lower courts simply counted overnight visits. However, after a careful review of Chapter 48 – Article 9 of the West Virginia Code, the body of case law pertaining to this chapter of the code, we find it is necessary to clarify this issue. While overnight visits can provide an important starting point, custodial responsibility consists of much more than merely providing a shelter for overnight visits. Rather, the

12

Legislature has specifically recognized that custodial responsibility encompasses the essential functions of parenthood such as:

> (1) Performing functions that meet the daily physical needs of the child. These functions include, but are not limited to, the following:
> (A) Feeding;
> (B) Dressing;
> (C) Bedtime and wake-up routines;
> (D) Caring for the child when sick or hurt;
> (E) Bathing and grooming;
> (F) Recreation and play;
> (G) Physical safety; and
> (H) Transportation.
> (2) Direction of the child's various developmental needs, including the acquisition of motor and language skills, toilet training, self-confidence and maturation;
> (3) Discipline, instruction in manners, assignment and supervision of chores and other tasks that attend to the child's needs for behavioral control and self-restraint;
> (4) Arrangements for the child's education, including remedial or special services appropriate to the child's needs and interests, communication with teachers and counselors and supervision of homework;
> (5) The development and maintenance of appropriate interpersonal relationships with peers, siblings and adults;
> (6) Arrangements for health care, which includes making medical appointments, communicating with health care providers and providing medical follow-up and home health care;
> (7) Moral guidance; and
> (8) Arrangement of alternative care by a family member, baby-sitter or other child care provider or facility, including investigation of alternatives, communication with providers and supervision.

W. Va. Code § 48-1-210 (LexisNexis 2015). Accordingly, we hold that for purposes of the parental relocation statute, West Virginia Code § 48-9-1 *et seq.,* "custodial

13

responsibility" includes duties innate to parenthood such as those defined as caretaking functions in West Virginia Code § 48-1-210 (LexisNexis 2015).

Because it is appropriate for caretaking functions to be taken into consideration when calculating the proportion of each parent's custodial responsibility, it is clear that the lower courts erred by considering only each parent's overnight visits with the children. Based on the evidence presented below, when caretaking functions are considered, it becomes evident that Mother unquestionably exercised the significant majority of custodial responsibility (more than seventy percent) for *both* children.[8]

---

[8] By focusing entirely on the number of overnight visits in the agreed parenting plan, the lower courts ignored the fact that Mother provided most of the caretaking responsibilities for the children, regardless of the overnight schedule in the plan. Even assuming, *arguendo*, that Father exercised more than thirty percent of the parenting time for one child, the question becomes how to address the best interests of both children, not just one in isolation as the lower courts did. Instead of averaging the children's time together or considering the best interests of both children, the lower courts chose to ignore the daughter's best interests entirely by hypothetically analyzing only those of the son. Although this Court does not direct parties to conduct an averaging of each party's percentage of custodial allocation, we would like to take this opportunity to emphasize the importance of sibling relationships. "In our case law, we have [ ] developed a policy that stable relationships should be preserved whenever feasible. We have held that the best interests of the child often include being kept with his or her siblings." *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 213, 429 S.E.2d 492, 495 (1993) (citing *James M. v. Maynard*, 185 W. Va. 648, 658, 408 S.E.2d 400, 410 (1991)). *See also Frankel v. Frankel*, 209 W. Va. 587, 590, 550 S.E.2d 377, 380 (2001) (per curiam) ("Likewise, we have recognized the importance of keeping siblings together."); *Kirby v. Fox*, 206 W. Va. 497, 526 S.E.2d 19 (1999) (per curiam) (finding that siblings in a post-divorce custody battle should be kept together because of their close relationship). Accordingly, we strongly encourage family and circuit courts to be mindful of sibling relationships when addressing the relocation of a parent or other issues that may impact the strong bond of siblings.

Accordingly, we find that the lower courts committed reversible error when they failed to consider evidence of caretaking functions when calculating custodial responsibility.

**2. "Good faith for a legitimate purpose."** Mother next argues that the lower courts committed reversible error when they determined that her proposed relocation was not in good faith. The lower courts looked to the language of the statute and found that Mother's relocation to Kentucky for a better paying job was indeed for a legitimate purpose. However, in the order denying modification of custodial allocation, the family court reasoned that "because of Mother's lack of attempts to obtain local employment, the Court does not find that the relocation would be in good faith, nor is there any evidence to support that the location is reasonable in light of the purpose."

In his brief, Father argues that the lower courts properly determined that Mother's proposed relocation was not in "good faith for a legitimate purpose" because she failed to conduct a proper job search in the Harrison County area. Father alleges that Mother limited her job search when seeking jobs in West Virginia (sought jobs in her chosen field), but widened her job scope when searching for jobs in Kentucky (looked outside of her chosen field). Father contends that Mother's calculated job search is the reason she found numerous opportunities in Kentucky, and also the reason that her relocation was not being sought in "good faith."

Under West Virginia Code § 48-9-403(d)(1),

> A parent who has been exercising a significant majority
> of the custodial responsibility for the child ***should be allowed
> to relocate with the child so long as that parent shows that the
> relocation is in good faith for a legitimate purpose and to a
> location that is reasonable in light of the purpose***. The
> percentage of custodial responsibility that constitutes a
> significant majority of custodial responsibility is seventy
> percent or more. A relocation is for a legitimate purpose if it
> is to be close to significant family or other support networks,
> for significant health reasons, to protect the safety of the child
> or another member of the child's household from significant
> risk of harm, to pursue a significant employment or educational
> opportunity or to be with one's spouse who is established, or
> who is pursuing a significant employment or educational
> opportunity, in another location. *The relocating parent has the
> burden of proving of the legitimacy of any other purpose.* ***A
> move with a legitimate purpose is reasonable unless its
> purpose is shown to be substantially achievable without
> moving or by moving to a location that is substantially less
> disruptive of the other parent's relationship to the child.***

(Emphasis added). After examining the plain language of the statute, it is clear that "when

the factors set forth in subsection (1) [of W. Va. Code § 48-9-403(d)] are met, the Court

*should* allow the parent who has been exercising the significant majority of custodial

responsibility to relocate with the children, and *shall* modify the parenting plan

accordingly, in a manner that is in the children's best interests." *Storrie v. Simmons*, 225

W.Va. 317, 325, 693 S.E.2d 70, 78 (2010) (per curiam) (emphasis in original). Although

not stated in express terms, it is evident that the statutory language creates a presumption

of reasonableness when the relocation is found to be legitimate. To bring clarity to this

issue, we now expressly hold that pursuant to West Virginia Code § 48-9-403(d)(1), if a

parent who is exercising a significant majority of the custodial responsibility for a child

16

proves that a proposed relocation is in good faith for a legitimate purpose, the location of the proposed move will be presumed to be reasonable. To overcome this presumption, the opposing parent must prove that the purpose of the move is substantially achievable without moving or by moving to a location that is substantially less disruptive of the opposing parent's relationship to the child.

In this case, as stated above, the family court found that Mother's proposed relocation *was* legitimate, *but not* "reasonable." However, Father failed to present any evidence to illustrate unreasonableness. Therefore, the initial finding of legitimacy was not rebutted, and the circuit court erred in concluding that Mother did not seek relocation that was "reasonable in light of the purpose." Because Mother showed that her proposed relocation was legitimate, the burden should have shifted to Father to show that the purpose of Mother's relocation could have been achieved by not moving, or by staying near Harrison County. The lower courts' findings that Mother's request to relocate was legitimate but not done in good faith or otherwise reasonable is contrary to the preponderance of the evidence that her economic opportunities in Kentucky more than doubled her income available in West Virginia; that she had a support network of family and friends in Kentucky; and that she gave as much notice as practicable in light of Father's refusal to go to mediation in March of 2017. Specifically, the family court found as follows:

> Based upon the clear language of the statute, which does not include any requirement to seek comparable employment where [Father] resides, the Court finds that

[Mother]'s relocation to Kentucky for the job she has procured is for a legitimate purpose. However, because of [Mother]'s lack of attempts to obtain local employment, the Court does not find that the relocation would be in good faith, nor is there any evidence to support that the location is reasonable in light of the purpose – particularly because it was unreasonable to not look for improved employment in Harrison and surrounding counties. [Mother] failed to show that the alleged purpose of her move, an increase in income, would not be substantially achievable without the move.

The lower courts' findings that Mother's relocation was not reasonable required an erroneous application of the applicable statute and the evidence presented.

First, the unrebutted evidence, ignored by both courts, is that Mother searched for employment in areas of reasonable proximity to Harrison County in November and December of 2016 before ultimately accepting a position in the Harrison County area. Once it became clear that she had minimal parenting support from Father, Mother sought employment in Kentucky where her friends, brother, and nephews resided and with whom she maintained a strong bond over the years.[9] Father proposed certain exhibits that included potential jobs for Mother, but during the August 1, 2017 hearing, she testified that she lacked the requisite qualifications for all the jobs Father suggested.[10]

---

[9] This Court previously has found that relocations to be near family is a legitimate purpose under the statute. *See, e.g.*, *Robert W. v. Paulette W.*, No. 15-1010, 2016 WL 2971191 (W. Va. May 20, 2016) (memorandum decision) ("West Virginia Code § 48-9-403(d)(1) provides that in such situations, a parent can relocate for a legitimate purpose to be with 'significant family or other support network.'").

[10] At the August 1, 2017 hearing, Mother provided testimony as to employment positions in West Virginia, which were suggested by Father in a potential exhibit provided to her attorney before the hearing; however, the exhibit was not filed in

18

Thus, because of the limited employment opportunities related to her skillset in the area, Mother's relocation to Kentucky was reasonable to achieve the purpose of advancing her economic opportunities. There is little evidence to support the lower courts' finding that Mother failed to timely and actively search for employment in North Central West Virginia, given her extensive search in November and December of 2016 – just a few months before her notice of relocation was filed.

Second, it is unrebutted that when Mother moved to Kentucky after the sale of the marital home, she lived with her close friends for a week before moving in with her brother pending a final ruling from the family court. As such, it is clear that her friends and family provided her with a strong support system in Kentucky. Despite this evidence, the family court somehow concluded that there was insufficient evidence to suggest Mother had a support network in Kentucky.

After a thorough review of this State's law, we are unable to find cases or statutes that specifically define what constitutes a good faith relocation. We find the family court's application of the term "good faith relocation" in this case to be misguided. *Cf. Storrie*, 225 W.Va. 317, 325, 693 S.E.2d 70, 78 (2010) (per curiam) ("[T]he family court ignored the clear statutory directive that permits a parent who has been exercising a

---

the record or offered into evidence during said hearing. Further, the jobs identified by Father were in Wood County, Monongalia County, Pennsylvania, and Connecticut—not Harrison County.

substantial majority of custodial responsibility to relocate with the child when the move is legitimate and reasonable."). The *Storrie* Court wisely avoided attempting to define good faith, given its amorphous meaning. *See* Black's Law Dictionary, 693 (6th ed. 1990) ("Good faith is an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage. . . .").

By January of 2017, it was clear that, despite his new, flexible job, Father did not intend to help Mother with the children, given that she continued to provide all medical and educational care for the children, in addition to most of the transportation to both children's extracurricular activities. In fact, as early as November of 2016, Father indicated that he expected Mother to pick the children up from school on his custodial days. Mother offered to mediate these issues in March of 2017, but Father refused.

Given these circumstances, Mother's stated desire to relocate to Kentucky to be near a support network to help her care for the children warrants a finding of "good faith" and "reasonableness." Because this Court finds that the unrebutted evidence shows Mother's relocation was legitimate and in good faith, the lower courts clearly erred in denying her request.[11]

---

[11] In light of our holding that the lower courts erred in denying Mother's petition for relocation, we need not address Father's contention that the family court erred by failing to adopt his proposed parenting plan. Further, after reviewing Father's cross-assignment of error in which he argues that the family court erred in denying his motion to

## B. *Refusal to Uphold Relief Sought in Temporary Order*

Given that the family court had already modified the parenting plan on a temporary basis to permit Mother to sell the marital home and begin employment in Kentucky, Mother contends that the ultimate denial of her request to relocate was clear error. She argues that this is especially true when considering the effect on the children of forcing Mother to return to West Virginia the day before school began with no home or employment. Further, evidence from a psychologist showed that the children should be established in their new residence prior to the school year, which could not be achieved under the family court's timeline. Despite Mother's reliance on the temporary summer parenting plan, this Court does not find that the lower courts erred when they entered a final order denying Mother's relocation *simply because* the temporary order accommodated Mother's relocation.

By amending the parenting plan to provide for alternate weeks of custody, the summer parenting plan gave Mother the flexibility to move to Kentucky to begin her new employment. After quitting her job in West Virginia and beginning her employment in Kentucky, she was successful in obtaining financing for a new home and made a monetary deposit thereon. However, despite her earnest efforts, Mother ignored the fact

dismiss based upon Mother's failure to comply with the relocation notice requirements of W. Va. Code § 48-9-403(b), we find that the lower courts did not abuse their discretion by refusing to grant his motion to dismiss. West Virginia Code § 48-9-403(b) is clear in describing the notice requirements for parental relocation, and after considering the specific facts of this case, we find that the lower courts properly found Mother's notice substantially complied with said requirements.

that the temporary parenting plan was a limited-in-time modification done for the children's summer vacation. Essentially, Mother erroneously relied on the family court's summer parenting plan in moving to Kentucky to start her new employment and purchase a home—all the while ignoring that this temporary plan would naturally expire in August of 2017, regardless of the family court's final decision.

In short, the family court's ruling does not amount to an abuse of discretion, considering that the summer parenting plan had a definitive expiration date. Mother took a risk when she decided to relocate based upon a temporary plan, and, unfortunately, the court's ultimate decision did not end in her favor. While this Court understands the effect that it had on her life and the lives of her children, the court was under no duty to grant a permanent relocation simply because it issued a temporary modification of the plan that accommodated her relocation. As such, this Court finds no error.

### C. Attorney's Fees under West Virginia Code § 48-1-305

Lastly, Mother argues that the lower courts erred by failing to order Father to pay her attorney's fees under West Virginia Code § 48-1-305 (LexisNexis 2015). Particularly, Mother contends that an award of attorney's fees is warranted because Father has "asserted unfounded claims or defenses for vexatious, wanton, or oppressive purposes." West Virginia Code § 48-1-305. We find this argument to be without merit.

22

"'The decision to award or not to award attorney's fees rests in the sound discretion of the circuit court, and the exercise of that discretion will not be disturbed on appeal except in cases of abuse.' Syl. pt. 2, in part, *Beto v. Stewart*, 213 W. Va. 355, 582 S.E.2d 802 (2003)." Syl. pt. 1, *Murthy v. Karpacs-Brown*, 237 W. Va. 490, 788 S.E.2d 18 (2016). More specifically, "the imposition of attorney fees is a matter within the family court's discretion." *E.O.R. v. M.D.W.*, No. 17-0355, 2018 WL 1218023 (W. Va. Mar. 8, 2018) (memorandum decision). Under West Virginia Code § 48-1-305(b):

> (b) The court *may* compel either party to pay attorney's fees and court costs reasonably necessary to enable the other party to prosecute or defend the action. . . .
>
> (c) When it appears to the court that a party has incurred attorney fees and costs unnecessarily because the opposing party has asserted unfounded claims or defenses . . . the court *may* order the offending party . . . to pay reasonable attorney fees and costs to the other party.

(Emphasis added). From a review of the evidence, we do not find that Father's claims were "unfounded," "vexatious," "wanton," or "oppressive." The family court acted within its discretion in not ordering Father to pay attorney's fees, and, as such, this Court finds no error.

## IV.

## CONCLUSION

For the reasons explained in the body of this opinion, the order of the Circuit Court of Harrison County entered December 7, 2017, is hereby reversed, and this matter is

23

remanded for entry of an order granting Mother's petition for modification and establishing a new parenting plan that allows Mother to relocate.

Reversed and Remanded.